Larry WHITTON, Appellee/Cross–Appellant,

v.

CITY OF GLADSTONE, MISSOURI, Appellant/Cross–Appellee.

Nos. 94–1286, 94–1287.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1994.

Decided May 15, 1995.

Linda J. Salfrank, Kansas City, MO, argued for appellant (Richard N. Bien, on brief).

William J. Hatley, Overland Park, KS, argued for appellee.

Before FAGG, WOLLMAN, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

The City of Gladstone, Missouri, appeals from the district court's order holding that several provisions of its sign code are impermissible restraints on free speech and therefore unconstitutional. Larry Whitton cross-appeals from the district court's order holding that other related provisions of the sign code are constitutional. We affirm in part and reverse in part.

## I.

Whitton owns residential and commercial property in Gladstone, Missouri. While running for sheriff of Clay County (within which Gladstone is a city) in 1992, he filed a complaint under 42 U.S.C. § 1983 challenging the constitutional validity of several sections of the Gladstone Sign Code that regulate the use of political signs. Whitton contended that these provisions of the sign code violated his First Amendment right of free speech because they hindered his ability to use his residential and commercial property to run for political office. After Whitton filed his complaint, Gladstone repealed its existing sign code and enacted a new one in its place.[1] Whitton then filed an amended complaint challenging the constitutionality of the following provisions of the newly enacted sign code regulating political signs: (1) section 25–45, which limits the placement or erection of political signs to 30 days prior to the election to which the sign pertains and re-

---

1. The old sign code was repealed the evening before a hearing was to be held in the district court on Whitton's request for a temporary restraining order and a preliminary injunction enjoining the enforcement of several provisions of the then-existing sign code regulating political signs. A new sign code was enacted the same evening. At the hearing the following day, the district court allowed Whitton to challenge the provisions of the new sign code regulating political signs. Whitton's requests for injunctive relief were denied. Further references to the "sign code" relate to the new sign code.

quires the removal of those signs within 7 days after the election ("durational limitations");[2] (2) section 25–46, which prohibits the external illumination of political signs ("external illumination prohibition");[3] and (3) section 25–47(B), which holds the candidate, on whose behalf a political sign is displayed, *prima facie* responsible for the placement, erection, and removal of those signs ("vicarious liability provision").[4] Gladstone answered by denying the allegations of Whitton's complaint.

■ The parties made cross-motions for summary judgment. The district court granted, in part, Whitton's motion for summary judgment, holding that the durational limitations in § 25–45 and the portion of the external illumination prohibition in § 25–46 that applied to commercial property are unconstitutional because they are content-based restrictions that do not survive strict scrutiny. *Whitton v. City of Gladstone, Mo.*, 832 F.Supp. 1329, 1335–37 (W.D.Mo.1993). However, the district court also granted, in part, the City's motion for summary judgment, ruling that the portion of the external illumination prohibition in § 25–46 that applies to residential property does not regulate on the basis of the content of the speech and is a constitutionally permissible time, place, and manner restriction. *Id.* at 1337–38. In a

later order in response to Whitton's motion to alter or amend the judgment, the court held that the vicarious liability provision in § 25–47(B) is also content-neutral and a constitutional time, place, and manner regulation. Gladstone appeals from that portion of the district court's judgment striking down provisions of the sign code as unconstitutional. Whitton cross-appeals the district court's order to the extent that it holds that the remaining challenged provisions of the sign code are constitutional.[5]

## II.

■ The First Amendment's Free Speech Clause states that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. The First Amendment is applicable to the political subdivisions of the states. *See Lovell v. Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938). "[S]igns are a form of expression protected by the Free Speech Clause...." *City of Ladue v. Gilleo*, —— U.S. ——, ——, 114 S.Ct. 2038, 2041, 129 L.Ed.2d 36 (1994). However, the Supreme Court recently stated that signs "pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses

2. Section 25–45 of the sign code is entitled "Restriction of political signs within zones." Part (A) states that no "[p]olitical signs located in an area zoned for residential use shall ... be placed or erected more than thirty (30) days prior to the election to which such sign pertains and such sign shall be removed within seven (7) days after such election." Similarly, part (B) states that no "[p]olitical signs located in an area zoned for industrial or commercial use shall ... be placed or erected more than thirty (30) days prior to the election to which such sign pertains and such sign shall be removed within seven (7) days after such election."

3. Section 25–46 is entitled "Illumination of political signs by external sources prohibited" and states that "[n]o political sign in any area of any zoned use may be lit by external sources with the sole purpose to light said sign."

4. Section 25–47 is entitled "Responsibility for Removal" and states in pertinent part:

B. The candidate on whose behalf any political sign is displayed, the chair person [sic] of

any political committeee [sic] for any such candidate, or the chairperson of any committee supporting or opposing any issue or proposition in any election concerning which a political sign is displayed, shall be deemed prima facie responsible for the placement, erection and removal of any such sign as required by this Article.

Moreover, § 25–49 outlines the available penalties for violations of those sections of the sign code relating to political signs. It allows for punishment by a fine not in excess of $500 or up to 90 days of imprisonment or both for such infractions.

5. Although the election for sheriff of Clay County is over, Whitton states that he plans to run for political office in the future, as well as assist others in doing so. Thus, this case is not moot because it involves issues which are "capable of repetition, yet evading review." *Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494–95, 23 L.Ed.2d 1 (1969) (quoting *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)).

for land, and pose other problems that legitimately call for regulation." *Id.* On the other hand, the Supreme Court has long recognized "that the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office," *Burson v. Freeman,* 504 U.S. 191, 196–97, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992) (internal citations and quotations omitted), and further that "[a] special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to *speak* there." *City of Ladue,* —— U.S. at ——, 114 S.Ct. at 2047. *See also McIntyre v. Ohio Elections Comm.,* —— U.S. ——, ——, 115 S.Ct. 1511, 1516–18, 131 L.Ed.2d 426 (1984) (political speech "occupies the core of the protection afforded by the First Amendment").

■ Therefore, we apply the familiar framework for evaluating the constitutionality of a restriction upon speech, like the sign code provisions at issue here. We first "determine whether [the] regulation is content-based or content-neutral, and then, based on the answer to that question, . . . apply the proper level of scrutiny." *City of Ladue,* —— U.S. at ——, 114 S.Ct. at 2047 (O'Connor, J., concurring). *See also Rappa v. New Castle County,* 18 F.3d 1043, 1053 (3d Cir.1994) ("the first step in First Amendment analysis [is] to determine whether a statute is content-neutral or content-based"). Gladstone contends that each challenged provision is a constitutionally permissible time, place, and manner restriction. A purported time, place, and manner restriction is constitutionally permissible so long as it is "justified without reference to the content of the regulated speech. . . ." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Therefore, our threshold inquiry for each challenged provision of the sign code necessarily focuses upon whether the provision at issue is a content-based restriction and then,

based upon the resolution of that question, we will apply the appropriate level of scrutiny.

## A. Durational Limitations (§ 25–45)

Section 25–45 of the sign code prohibits a commercial or residential landowner from placing a *political* sign on his property more than 30 days prior to the election to which the sign pertains and requires the sign to be removed within 7 days of the election. Gladstone contends that § 25–45 does not regulate speech on the basis of its content and is a reasonable time, place, and manner restriction because it has significant interests in maintaining the City's aesthetic beauty and promoting traffic safety, and political signs significantly detract from these interests. Whitton maintains that the restriction is content-based because it distinguishes among signs based upon their subject matter and it affords commercial speech a greater degree of protection than political speech and, further, that the regulation does not pass strict scrutiny because Gladstone's interests, while substantial, are not compelling, and less restrictive means exist for achieving Gladstone's concerns. The district court ruled that the durational limitations are content-based regulations because they "favor[ ] commercial speech over noncommercial speech" and "distinguish[ ] between permissible and impermissible signs on the basis of the signs' content." *Whitton,* 832 F.Supp. at 1333. The court further found that the provisions fail to survive strict scrutiny because Gladstone's stated interests are not compelling and the restrictions are not narrowly tailored to enhance traffic safety and preserve the City's aesthetics. *Id.* at 1335.

■ We agree with the district court that § 25–45, containing the durational limitations which are applicable only to political signs, is a content-based restriction.[6] The Supreme Court has held that a restriction on speech is content-based when the message conveyed determines whether the speech is subject to

---

6. In conducting our analysis of this provision, we make no distinction between the durational limitations as applied to signs on residential property (§ 25–45(A)) and signs on commercial property (§ 25–45(B)), and we also make no distinction between the preelection 30–day erection limitation versus the postelection 7–day removal requirement because our analysis and the result are the same as to each.

the restriction. *See City of Cincinnati v. Discovery Network, Inc.,* — U.S. —, —–—, 113 S.Ct. 1505, 1516–17, 123 L.Ed.2d 99 (1993). In *Cincinnati,* the Supreme Court evaluated the constitutionality of an ordinance which prohibited newsracks distributing commercial handbills but allowed newsracks selling newspapers. *Id.* at —, 113 S.Ct. at 1516. The Supreme Court held that "[u]nder the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content-based.'" *Id.* at —–—, 113 S.Ct. at 1516–17.[7]

Simply stated, § 25–45 is content-based because it makes impermissible distinctions based *solely* on the content or message conveyed by the sign. The words on a sign define whether it is subject to the durational limitations in § 25–45. For instance, in some residentially-zoned areas of Gladstone, *see* § 25–28(B)(1), a permanent year around ground sign expressing support for a particular sports team would not be subjected to the durational limitations while an identical sign made of the same material, with the same dimensions and the same colors, and erected on the same spot advocating a particular candidate for political office would be.[8] In other residentially-zoned areas of Gladstone, *see* § 25–28(A)(3), a church may erect a permanent ground sign indicating upcoming church activities and times of services for an unlimited duration while the same sign could be posted for a total of only 38 days (30 days

before election and seven days after) if it expressed its support for a church member's political candidacy. Finally, businesses in Gladstone's commercially-zoned areas may erect signs advertising upcoming events as far in advance of the event as they choose while identical signs supporting political candidates must follow the durational restrictions of § 25–45. *See also Linmark Assoc., Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (invalidating as impermissible content-based restriction township ordinance prohibiting "For Sale" and "Sold" signs).

Section 25–45 is also constitutionally suspect because it grants certain forms of commercial speech a greater degree of protection than noncommercial political speech, a practice which a plurality of the Supreme Court held to be content-based in *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). The *Metromedia* Court ruled that a San Diego billboard ordinance, which generally prohibited billboards in the city but exempted on-site billboards that identified the owner or occupant of the premises or that advertised goods available on the property, was a content-based regulation because it granted commercial speech a greater degree of protection than noncommercial speech. *Id.* at 513–17, 101 S.Ct. at 2895–97. Here, the sign code makes equally impermissible distinctions between commercial speech and noncommercial speech. The sign code, for example, permits construction signs to be erected 90 days prior to commencement of construction of a project and does not require removal until 10 days

7. We do not find the Supreme Court's recent opinion in *Ladue* to be dispositive of the outcome here. In *Ladue,* the Supreme Court addressed a challenge to the constitutionality of a Ladue, Missouri, ordinance which banned all residential signs except those falling within ten narrowly-defined exemptions. *City of Ladue,* — U.S. at —–—, 114 S.Ct. at 2040–41. The Court assumed, for the purposes of deciding the case, that the ordinance was a content-neutral restriction. *Id.* at —, 114 S.Ct. at 2044. Thus, the Court did not address the first issue which we must decide: whether the restrictions on political signs in this case are content-based or content-neutral. Moreover, neither party before this court has argued that *City of Ladue* is dispositive of the issues contained in this case.

8. During oral argument, counsel for the City of Gladstone conceded that a sign stating "Go Royals" would not be subject to the durational limitations while a sign constructed with the same materials and on precisely the same spot stating "Go Ashcroft" would be. Counsel for Gladstone also conceded that a sign urging the impeachment of the President of the United States would not fall within the definition of a political sign (and thus not subject to the durational limitations) while a sign urging the reelection of the President would be. In fact, in these areas, a permanent ground sign with *no* message could be erected and would not be subjected to the durational limitations while the same sign advocating a political candidate would be.

after completion of the project. *See* Article III, section H. Businesses are allowed to advertise upcoming events as far in advance as they choose. Real estate signs are not governed by a durational restriction and may be displayed under the sign code for any length of time. Obsolete commercial signs are permitted to remain posted for up to 30 days after the discontinuance of the business to which the sign pertains. *See* §§ 25–8 and 25–19. Political signs, however, are only permitted to be erected 30 days prior to the election to which they pertain and must be removed within 7 days of the election. Thus, certain forms of commercial speech are treated more favorably than political speech, and for that reason as well, § 25–45 is a content-based restriction.[9] Other courts, applying *Metromedia*, have reached similar results. *See, e.g., Matthews v. Town of Needham*, 764 F.2d 58, 60 (1st Cir.1985) (local bylaw which prohibited political signs but allowed "For Sale" signs, professional office signs, contractors' advertisements, and signs erected for religious causes impermissible content-based restriction); *National Advertising Co. v. Town of Babylon*, 900 F.2d 551, 556–57 (2d Cir.) (applying standard of *Metromedia* plurality in invalidating on First Amendment grounds content-based ordinance favoring commercial speech over noncommercial speech), *cert. denied*, 498 U.S. 852, 111 S.Ct. 146, 112 L.Ed.2d 112 (1990); *Major Media of the Southeast v. City of Raleigh*, 792 F.2d 1269, 1272 (4th Cir.1986) (applying *Metromedia* plurality standard to uphold city signage ordinance because ordinance allowed substitution of noncommercial messages where commercial messages were permitted), *cert. denied*, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987).

Gladstone contends that § 25–45 is content-neutral because the durational limitations apply across-the-board to all political candidates, not just candidates from a particular party or espousing a particular viewpoint. However, the argument that a re-

striction on speech is content-neutral because it is viewpoint-neutral has been repeatedly rejected by the Supreme Court. *See Consolidated Edison v. Public Serv. Comm'n*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980) (addressing prohibition on utilities from including inserts in monthly electric bills discussing desirability of nuclear power, the Court stated that "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic"). *See also Burson*, 504 U.S. at 196–97, 112 S.Ct. at 1850 (Tennessee statute which prohibited the solicitation of votes and display of campaign material within 100 feet of polling place on election day content-based even though it applied to *all* political speech).

Gladstone also asserts that the Supreme Court announced a new standard for determining whether restrictions on speech are content-based in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), and that under this standard, § 25–45 is a content-neutral restriction. In *Ward*, the Supreme Court stated that "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, and manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." *Id.* at 791, 109 S.Ct. at 2754 (internal citations omitted). The Court went on to state that "[g]overnment regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" *Id.* (quoting *Clark*, 468 U.S. at 293, 104 S.Ct. at 3069). Gladstone argues that its stated purpose in enacting § 25–45 (and the other political sign restrictions) was to promote traffic safety and maintain the City's aesthetic beauty and

---

9. Gladstone argues that it favors political speech over commercial speech because some commercial signs are subject to application and permit requirements while political signs are not. However, no permit is required to erect a construction sign or real estate sign and these signs may be posted longer than political signs are. More-

over, we are aware of no authority which allows restrictions imposed on commercial speech to offset other restrictions imposed on noncommercial speech, achieving a sort of balance, in order to render the challenged provision content-neutral.

offers § 25–50 of the sign code as support.[10] Gladstone argues that under *Ward*, its political sign restrictions are constitutionally sound because its stated purpose controls the case, and the stated purpose is "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753 (internal citation omitted).

We reject this argument. We do not read *Ward* to mandate that reviewing courts are required to accept legislative explanations from a governmental entity regarding the purpose(s) for a restriction on speech without further inquiry. *Ward* merely instructs reviewing courts to give controlling weight to what the court determines is the government's true purpose for enacting it. More importantly, however, the Supreme Court recognized in *City of Cincinnati*, ── U.S. at ──, 113 S.Ct. at 1517, a case decided after *Ward* (and joined by the author of *Ward* without comment), that even when a government supplies a content-neutral justification for the regulation, that justification is not given controlling weight without further inquiry. In response to Cincinnati's argument that its prohibition on the distribution of commercial handbills on public property was a time, place, and manner restriction because its purpose was to promote safety and aesthetics, the Court stated:

> The argument is unpersuasive because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech. True, there is no evidence that the city has acted with animus toward the ideas contained within respondents' publications, but just last Term we expressly rejected the argument that discriminatory ... treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas. Regardless of the *mens rea* of the city, it has enacted a sweeping ban

on the use of newsracks that distribute 'commercial handbills,' but not 'newspapers.' Under the city's newsrack policy, whether any particular newsrack falls with the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content-based.'

> Nor are we persuaded that our statements that the test for whether a regulation is content-based turns on the 'justification' for the regulation compel a different conclusion. We agree with the city that its desire to limit the total number of newsracks is 'justified' by its interest in safety and esthetics. The city has not, however, limited the number of newsracks; it has limited (to zero) the number of newsracks *distributing commercial publications*. As we have explained, there is no justification for that particular regulation other than the city's naked assertion that commercial speech has 'low value.' It is the absence of a neutral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content-neutral.

*Id.* at ── ── ──, 113 S.Ct. at 1516–17 (internal citations and quotations omitted). Our case is conceptually identical to *Cincinnati*. Thus, even if we agree with the City of Gladstone that its restriction is "justified" by its interest in maintaining traffic safety and preserving aesthetic beauty, we still must ask whether the regulation *accomplishes* the stated purpose in a content-neutral manner. Gladstone has not limited the durational period of signs generally; it has limited the duration of *political signs* of any kind, temporary or permanent, in particular. "Thus, by any commonsense understanding of the term, the [restriction] in this case is 'content-

---

10. Section 25–50 is entitled "Legislative Purpose and Intent of Political Sign Sections" and purports to outline the Gladstone City Council's purpose for enacting the provisions of the sign code regulating political signs. The Council determined that political signs, due to their temporary nature, structure, and method of installation, as well as susceptibility to adverse weather conditions, pose risks to citizens and property different in kind from other signs permitted under the code. *See* § 25–50(C). The Council also concluded that the unrestricted proliferation of political signs would detract from the City's aesthetic beauty and consequently have an adverse impact on the local economy. *See* § 25–50(E). For these reasons, the Council stated that the interests sought to be served by the restrictions "are sufficiently substantial to justify the content-neutral regulation represented by this section." *See* § 25–50(F).

based.'" *Id.* at ——–——, 113 S.Ct. at 1516–17.

The First Circuit interpreted *Cincinnati* in a similar manner in its recent opinion in *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). In *Dedham,* a local theater challenged on First Amendment grounds a Dedham ordinance which prohibited certain licensed activities for which a fee of admission is charged (such as concerts, dances, exhibitions, and public shows) from being conducted between the hours of 1:00 a.m. and 6:00 a.m. *Id.* at 734–35. In distinguishing *Cincinnati* from the facts presented, the court observed that "[w]hether Cincinnati's regulation applied to a particular newsrack was determined by necessary reference to the subject matter of the specific publications contained therein—a telltale harbinger of content-based regulation," while Dedham's challenged regulation applied without reference to the content of any speech because the applicability determination rested upon the existence of an admission fee. *Id.* at 738. The court went on to state that the *Cincinnati:*

> holding pivots on the conclusion that, though the city's underlying purpose in enacting the ordinance was proper, the differential treatment of speakers had no relationship to the underlying purpose. Thus, [*Cincinnati*] establishes a much narrower proposition: that, even when a municipality passes an ordinance aimed solely at the secondary effects of protected speech (rather than at speech *per se* ), the ordinance may nevertheless be deemed content-based if the municipality differentiates between speakers *for reasons unrelated to the legitimate interests that prompted the regulation.*

*Id.* (internal citation omitted). Under this standard, the inquiry focused on "whether there are any secondary effects attributable

to licensed (commercial) amusements that distinguish them from the unlicensed (noncommercial) amusements that Dedham has left unregulated." *Id.* See also *Carey v. Brown,* 447 U.S. 455, 465, 100 S.Ct. 2286, 2292–93, 65 L.Ed.2d 263 (1980) (striking down statute which prohibited picketing generally but exempted labor picketing because "nothing in the content-based labor-nonlabor distinction ha[d] any bearing" on the state's asserted interest in privacy).

Although Gladstone's justification for enacting the durational limitations was to curtail the traffic dangers which political signs pose and to promote aesthetic beauty, Gladstone has not seen fit to apply such restrictions to *identical signs* displaying nonpolitical messages which present *identical concerns.* Thus, like Cincinnati, Gladstone "differentiates between speakers for reasons unrelated to the legitimate interests that prompted the regulation." *Town of Dedham,* 43 F.3d at 738.

The dissent posits that "the unique nature of election signs, including their fragility, brief relevance, and sheer numbers, poses a special threat to the ordinance's stated neutral goals of promoting aesthetics and traffic safety." *Infra* at 1412. However, as noted above, a sign which stated "Go Royals" would not be subjected to the durational limitations while a sign stating "Go Ashcroft" would, even though the signs were made of the same material, installed in the same manner, erected on the same spot, posed the same traffic hazards and detracted from the City's aesthetic beauty in the same manner. Like the Court in *Cincinnati,* we conclude that despite Gladstone's laudable asserted purposes for enacting the durational limitations (traffic safety and aesthetic beauty), whether or not a sign falls within the limitations imposed by § 25–45 is based solely upon the message conveyed by the sign, i.e., is it a "political" sign, and is therefore a content-based restriction.[11]

---

11. Gladstone also argues that the "secondary effects" doctrine from *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), is applicable in this case. Gladstone contends that, assuming the durational restriction is content-based, it is justified by

Gladstone's desire to eliminate certain undesirable effects of political signs, namely vandalism and maintenance problems, which in turn contribute to aesthetic and safety concerns. However, the Supreme Court addressed a similar argument in *Cincinnati* and held that "[i]n contrast to

Because we have concluded that the durational limitations are content-based restrictions, they must be subjected to strict scrutiny. *See Perry Ed. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). "[I]t is the rare case in which ... a law survives strict scrutiny." *Burson,* 504 U.S. at 211, 112 S.Ct. at 1857. "With rare exceptions, content discrimination in regulations of the speech of private citizens on private property ... is presumptively impermissible, and this presumption is a very strong one." *City of Ladue,* —— U.S. at ——, 114 S.Ct. at 2047 (O'Connor, J., concurring). "[C]ontent-based restrictions on political speech 'must be subjected to the most exacting scrutiny.'" *Ward,* 491 U.S. at 798 n. 6, 109 S.Ct. at 2758 n. 6 (quoting *Boos,* 485 U.S. at 321, 108 S.Ct. at 1164). "For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Ed. Ass'n,* 460 U.S. at 45, 103 S.Ct. at 955. The requirement that a restriction on speech be narrowly drawn requires the regulation to be the "least restrictive" alternative available. *Ward,* 491 U.S. at 798 n. 6, 109 S.Ct. at 2758 n. 6 (quoting *Boos,* 485 U.S. at 329, 108 S.Ct. at 1168).

As the experienced district judge observed, a municipality's asserted interests in traffic safety and aesthetics, while significant, have never been held to be compelling. *Whitton,* 832 F.Supp. at 1335. Moreover, the durational restrictions are not narrowly-tailored to achieve their aims. Gladstone argues that it has an interest in promoting traffic safety by reducing the number of signs that obstruct motorists' vision. However, Gladstone already has regulations in place concerning the dimensions of political signs (not greater than 2' × 2') along with the total amount of square footage of political signage (64 feet²)

permitted per residential lot which adequately promote this interest. *See* § 25–45. Gladstone also contends that political signs pose unique dangers to passing motorists because their sole purpose is to capture an individual's attention, and with such distractions come increased dangers in automobile accidents. However, we observe that the first purpose of any sign is to capture the attention of passersby [12] and further, Gladstone has not presented sufficient evidence that political signs more effectively capture the attention of individuals nor present graver dangers than other signs which are allowed to be posted for much longer periods, nor that lot line set back requirements would not meet the perceived traffic danger.

Gladstone also argues that political signs detract from the City's beauty because the signs are usually inexpensively constructed and intended to be temporary in nature and, due to their susceptibility to the elements and vandalism, can leave an unsightly mess if they are posted too long. However, again Gladstone already has in place measures, applicable to all signs, which adequately address these issues. *See* §§ 25–10, 25–12. Gladstone has presented no evidence that enforcement of these existing provisions is insufficient to alleviate its interests in maintaining the City's aesthetic beauty. We take note of the Supreme Court's observation in *City of Ladue* "that individual residents themselves have strong incentives to keep their own property values up and to prevent 'visual clutter' in their own yards and neighborhoods.... [A] resident's self interest diminishes the danger of the 'unlimited' proliferation of residential signs that concerns the City of Ladue." *Id.* at ——, 114 S.Ct. at 2047. Finally, Gladstone has not presented sufficient evidence that political signs detract from the aesthetics of the City any more than other signs permitted to stand for longer periods.

---

the speech at issue in *Renton,* there are no secondary effects attributable to respondent publishers' newsracks that distinguish them from the newsracks Cincinnati permits to remain on its sidewalks." *City of Cincinnati,* —— U.S. at ——, 113 S.Ct. at 1517. Likewise, here there are no secondary effects attributable to political signs which distinguish them from other permitted signs under the code which are not subject to the

durational limitations, and therefore we decline to apply *Renton* to the present case.

**12.** Indeed § 25–8 of Gladstone's ordinance defines "sign" as "[a]ny medium which is used or intended to be used to attract attention to any subject matter...."

We agree with the district court's assessment that "regarding both traffic safety and aesthetics, the city could regulate the construction of the signs, amount of signage and the duration of time a temporary political sign can remain before the candidate or committee must remove or replace the sign," measures which adequately address the ills sought to be suppressed and are less restrictive means of doing so. *Whitton*, 832 F.Supp. at 1335–36.[13] Therefore, we conclude that Gladstone's durational limitations in § 25–45, as applied to both residential and commercial property, are content-based restrictions which fail to satisfy strict scrutiny and are, therefore, unconstitutional restraints on free speech.

**B. External Illumination Prohibition (§ 25–46)**

Section 25–46 prohibits external illumination of political signs. The district court held that the portion of this provision that applies to signs in a commercial zone is an impermissible content-based restriction because Gladstone allows businesses to externally illuminate commercial signs erected on their commercially-zoned property. *Whitton*, 832 F.Supp. at 1337. However, the district court held that the portion of the provision that applies to residential property is content-neutral and a reasonable time, place, and manner restriction because the sign code does not permit external illumination of any sign on residential property. *Id.* at 1337–38. Gladstone appeals the district court's decision holding that § 25–46 is unconstitutional as applied to commercial property. Whitton appeals the district court's decision holding that § 25–46 is constitutional as applied to residential property.

■ We agree with the district court that the portion of § 25–46 that applies to commercial property is a content-based restriction which fails to survive strict scrutiny for many of the reasons outlined in the previous section discussing § 25–45 (Part IIA). For example, § 25–17(B) of the sign code allows ground signs under 30 square feet in area to be externally illuminated.[14] Thus, a 2′ × 2′ permanent ground sign may be erected on commercial property and externally illuminated if it advertises an upcoming nonpolitical event; however, the same sign could not be externally illuminated if it expresses support for a political candidate. Again, the operative distinction is the message conveyed by the sign, making the regulation content-based.

We similarly conclude that this provision also fails to pass strict scrutiny. As we noted in Part IIA, while traffic safety and aesthetic beauty are admittedly substantial interests, they are not compelling governmental interests. Further, the restriction is not narrowly drawn to accomplish its purported purpose. Section 25–17(D) of the sign code mandates that all illuminated signs must be operated in such a manner as not to impose a danger to passing motorists.[15] Moreover, Gladstone has made no showing that external illumination of political signs on commercial property creates dangers or detracts from aesthetic beauty any differently than other signs which are permitted to be externally illuminated. Thus, we conclude that the district court committed no error in finding that § 25–46 of the sign code is unconstitutional as applied to commercial property.

However, we disagree with the district court's holding regarding the application of § 25–46 to residential property. The sign code permits the erection of some type of ground sign in all of the residentially-zoned

---

13. For instance, Gladstone could require that any political sign be posted for a maximum period of 90 days before it is removed or replaced. *See City of Waterloo v. Markham*, 234 Ill.App.3d 744, 175 Ill.Dec. 862, 865, 600 N.E.2d 1320, 1323 (1992) ("Nothing in the ordinance prohibits the defendants from erecting a different temporary sign one day after dismantling their first temporary sign.") Whitton concedes that such a measure would be constitutional.

14. Section 25–17(B) provides that "[g]round signs exceeding thirty feet in area may only be internally illuminated."

15. Section 25–17(D) states that "[a]ll illumination shall be operated in such a manner and at such times as not to cause a direct glare of light upon the occupants of neighboring properties or upon drivers of vehicles traveling the public streets."

areas. *See* § 25–28(A)–(B). As long as the ground sign is less than 30 square feet in size, it may be externally illuminated, *see* § 25–17(B), *except* that no political sign of any kind may be externally illuminated. *See* § 25–46. Because the message on the sign determines whether or not it may be externally illuminated in a residentially-zoned area, we conclude that § 25–46, as applied to residential property, is a content-based restriction. For the same reasons § 25–46 failed to pass strict scrutiny as applied to commercial property, it also does not withstand strict scrutiny when it is applied to residential property.

Therefore, we affirm the district court's holding that § 25–46 is unconstitutional as applied to commercially-zoned property, and we reverse its holding that § 25–46 is constitutional as applied to residential property.

*C. Vicarious Liability Provision (§ 25–47(B))*

■ Section 25–47(B) holds political candidates *"prima facie* responsible for the placement, erection and removal of" their political signs. In response to Whitton's request to alter or amend the court's previous judgment, the district court held that § 25–47(B) is a reasonable time, place, and manner restriction. Whitton argues that this section is a content-based restriction because only political candidates whose political signs violate provisions of the sign code are subject to the burden-shifting mandated by this section. We agree.

Under the sign code, there are no other provisions which hold a party presumptively responsible for code infractions. Thus, a business that erects a sign advertising its products or services that is in excess of the square footage allowance is not held *prima facie* responsible for the violation. Similarly, a residential landowner who places a permanent ground sign too close to the curb line is not subject to the burden shifting provisions of § 25–47(B). Only a political candidate whose political sign is in violation of the sign code is held vicariously *prima facie* liable for violations. Again, because the particular message on the sign dictates whether it is subject to the challenged restriction, it too is a content-based restriction.

Like the provisions examined above, this section cannot withstand the rigors of strict scrutiny. Gladstone has offered no interests which it seeks to serve or protect through the enactment of this provision. Section 25–50, which outlines the legislative purpose and intent regarding the restrictions peculiar to political signs, makes no reference to § 25–47(B). Likewise, the restriction is not narrowly tailored. Gladstone could subject political candidates to prosecution in the same manner as other sign code violators and has not provided any rationale for the disparate treatment of political candidates whose signs violate the sign code.[16]

We conclude that § 25–47(B) is a content-based restriction that does not withstand strict scrutiny. Accordingly, we reverse the district court's holding that it is a constitutionally permissible time, place, and manner restriction.

### III.

In ruling as we have today, we are not unsympathetic to Gladstone's concern for controlling the unrestricted proliferation of political signs. However, when the remedy the local government chooses conflicts with the constitutionally-guaranteed right to free speech, and in particular the political speech so fundamental to our democracy, such concerns must yield. For the reasons outlined above, we affirm the district court's judgment that § 25–45 is unconstitutional and that § 25–46 is unconstitutional as applied to commercial property. We reverse the district court's judgment that § 25–46 is consti-

---

**16.** Enforcement of this provision as it is currently drafted could lead to the anomalous result of a political candidate being forced to prove his innocence for an infraction of the sign code regarding a sign which purports to advocate the candidate but was in fact planted by the candidate's opponent. Along the same lines, a candidate would be *prima facie* responsible for viola-tions of the sign code for not only political signs he erected, but also for signs his supporters erected on his behalf. These results would conflict with our holding in *Video Software Dealers Ass'n v. Webster,* 968 F.2d 684, 690 (8th Cir. 1992), wherein we stated that "any statute that chills the exercise of First Amendment rights must contain a knowledge element."

tutional as applied to residential property and that § 25–47(B) is constitutional.[17]

FAGG, Circuit Judge, dissenting.

Because the majority concludes Gladstone's durational limitations on political campaign signs, i.e., election signs, are content based, the majority applies strict scrutiny rather than the more deferential level of scrutiny applicable to content-neutral restrictions. *Supra* at 1408. I believe the durational limitations are content neutral and would thus apply the more deferential standard. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989) (content-neutral restrictions on the time, place, or manner of protected speech need only be narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for information's communication). In my view, Gladstone can place reasonable time restrictions on the posting of election signs without also restricting other yard signs because the City found election signs pose a special threat to the neutral legislative goals of aesthetics and traffic safety. Analyzed under the deferential standard, I conclude the durational limitations are valid time, place, or manner restrictions. I thus respectfully dissent from Part II(A) of the majority's opinion, *supra* at 1403–09.

Valid time, place, or manner restrictions must be content neutral. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753–54. The main inquiry in deciding content neutrality, especially in time, place, or manner cases,

> is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or

messages but not others. Government regulation of expressive activity is content neutral so long as it is *"justified* without reference to the content of the regulated speech."

*Id.* (Court's emphasis) (citations omitted) (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). Even when a regulation applies only to a particular category of speech, the regulation may be content neutral if the regulation's justification has nothing to do with that speech, that is, the regulation does not aim to suppress free expression. *Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988).

I believe Gladstone's durational limitations on election signs are content neutral because they are " *'justified* without reference to the content of the regulated speech.' " *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753–54 (Court's emphasis) (quoting *Clark,* 468 U.S. at 293, 104 S.Ct. at 3069). The stated purposes of the durational limitations are the promotion of aesthetics and traffic safety. These goals have nothing to do with the content of the election signs or with preventing the communication of election messages. *See Boos,* 485 U.S. at 320, 108 S.Ct. at 1163. The goals are unrelated to the suppression of ideas. *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984).

In concluding the limitations are content based, I believe the majority misconstrues *City of Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). *Supra* at 1403–05, 1406–07. In *City of Cincinnati,* the Supreme Court held that although Cincinnati's goal of limiting the total number of newsracks was "justified" by its interest in safety and aesthetics, Cincinnati lacked a neutral justification for its regulation of only a subgroup of news-

---

**17.** We decline to address Gladstone's argument that Whitton should be denied relief under the "clean hands" doctrine because, as a prior member of the Gladstone City Council (1981–1984, 1987–1990), he helped enact several of the provisions he is now challenging. However, the record indicates that the durational limitations and the vicarious liability provision were originally enacted in 1978 and the prohibition against external illumination was originally enacted in 1986. Whitton was not on the Council during either period of time. We believe that his mere membership on the Council and limited participation in making modifications and amendments to the sign code during his tenure do not bar him from seeking relief.

racks that distributed commercial publications, rather than all newsracks. —— U.S. at ——, 113 S.Ct. at 1517. In contrast, Gladstone has a neutral justification for placing special restrictions on only election signs as a subgroup of all yard signs, and the limitation enacted by Gladstone applies to the entire subgroup of election signs. Gladstone's City Council determined that election signs pose risks to citizens and property different in kind from other yard signs. *Supra* at 1406 n. 10. In other words, the unique nature of election signs, including their fragility, brief relevance, and sheer numbers, poses a special threat to the ordinance's stated neutral goals of promoting aesthetics and traffic safety. The durational limitations are content neutral even though they apply only to election signs because the neutral regulatory goals of aesthetics and traffic safety are particularly associated with election signs. *See Boos,* 485 U.S. at 320, 108 S.Ct. at 1163.

Although my colleagues do not reach the analysis for content-neutral regulations, I believe the durational limitations are valid time, place, or manner restrictions. First, the durational limitation is " 'narrowly tailored to serve a significant governmental interest.' " *Ward,* 491 U.S. at 796, 109 S.Ct. at 2756 (quoting *Community for Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. at 3069). Gladstone has a substantial interest in advancing the goals of aesthetics and traffic safety. *See Taxpayers for Vincent,* 466 U.S. at 805, 807, 104 S.Ct. at 2129, 2130. The 38–day durational limitations are also a narrowly tailored means of achieving these goals. The limitations "need not be the least restrictive or least intrusive means" of serving the City's goals. *Ward,* 491 U.S. at 798, 109 S.Ct. at 2757. Rather, the limitations are narrowly tailored if the City's interest "would be achieved less effectively absent the regulation." *Id.* at 799, 109 S.Ct. at 2758. That is the case here. Second, the durational limitations "leave open ample alternative channels of communication." *Id.* at 802, 109 S.Ct. at 2760. Outside as well as during the 38–day period when election signs may be posted, candidates can seek and individual property owners can express support in other ways. For example, candidates could dis-

tribute handbills, make telephone solicitations, host campaign receptions, give speeches, and run advertisements on the radio, television or in print. Individual property owners could wear campaign buttons, put bumper stickers on their cars, and place signs in the windows of their homes or businesses.

I would reverse the district court's holding that the durational limitations violate the First Amendment.