# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1554
No. 09-2691

_____

| | | |
|---|---|---|
| Mohamed A. El-Tabech, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Harold Clarke, et al., | * | |
| | * | |
| Defendants - Appellants.. | * | |

_____

Submitted: April 13, 2010
Filed: August 13, 2010

_____

Before LOKEN, COLLOTON, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

Mohamed El-Tabech, a Muslim inmate serving consecutive life sentences in Nebraska's Tecumseh State Correctional Institution (TSCI), commenced this 42 U.S.C. § 1983 action alleging that prison officials were violating his religious rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.* After a bench trial, the district court issued an order requiring defendants to post a copy of his prayer schedule so that TSCI guards are aware of it and directing the parties to negotiate procedures to provide El-Tabech kosher meals. El-Tabech v. Clarke, Mem. & Order dated July 17, 2007 (D. Neb. No. 4:04cv3231). Ten weeks later, granting the parties' Joint

Stipulation, the court ordered defendants to implement a stipulated "Kosher Equipment and Meal Preparation Process" to provide El-Tabech "a nutritionally-sufficient kosher diet, in accordance with Nebraska Department of Corrections Services policies and procedures," and to allow "a person with expertise in the area of kosher diet preparation and service" to verify that "the Kosher Process, once implemented . . . meet[s] Defendants' stated commitment to never serve Mr. El-Tabech non-kosher food." Order dated Oct. 5, 2007. In May 2008, the court awarded El-Tabech as prevailing party attorneys' fees and costs, as authorized by 42 U.S.C. § 1988(b). None of these orders was appealed.

In October 2008, El-Tabech moved for an order under Rules 69(a) and 70 of the Federal Rules of Civil Procedure directing defendants to pay the fee award to El-Tabech's attorneys and increasing the post-judgment interest rate payable on that award. On February 4, 2009, the district court granted the motion. In Case No. 09-1554, the State appeals that order. In August 2008, El-Tabech moved for an order holding defendants in contempt for alleged violations of the injunction orders. On March 4, 2009, the district court granted El-Tabech the relief requested on one claim, modifying the stipulated injunction to require that El-Tabech be provided only prepackaged kosher foods. He promptly submitted a supplemental fee request, which the district court granted on June 10, 2009, awarding $73,360.20 in attorneys' fees and $271.20 in costs for post-judgment work. In Case No. 09-2691, the State appealed both orders. We dismissed the appeal of the contempt order as untimely, leaving only the appeal of the supplemental fee award. We consolidated the two cases on appeal and now reverse both orders and remand for further proceedings.

## I. Enforcing the Original Fee Award (No. 09-1554)

Though the Eleventh Amendment bars an award of damages against a State in a § 1983 action, a federal court may award attorneys' fees and other costs against the State under § 1988 as part of the prospective injunctive relief authorized in the

landmark decision <u>Ex parte Young</u>, 209 U.S. 123 (1908). <u>See</u> <u>Hutto v. Finney</u>, 437 U.S. 678, 689-98 (1978). A Nebraska statute first enacted in 1982 expressly provides that a federal court award of fees and expenses against the State "shall be paid in the manner provided in the State Miscellaneous Claims Act." Neb. Rev. Stat. § 25-1806. The Miscellaneous Claims Act (MCA) provides that a claim must be submitted to the State Claims Board and, if approved by the Board, a claim for more than $50,000 "shall be reviewed by the Legislature [at its next session] and an appropriation made therefor if appropriate." Neb. Rev. Stat. § 81-8,300.

Time sheets submitted in support of El-Tabech's request for a supplemental fee award reveal that his attorneys began researching a "legal basis to challenge state statutory restrictions upon enforcing a federal court judgment" in February 2008. On May 5, some two months later, the district court awarded El-Tabech $204,986.28 in attorneys' fees and costs as the prevailing party. In late October, he filed a motion for relief under Rules 69(a) and 70 of the Federal Rules of Civil Procedure. In support, counsel submitted an affidavit averring that, on October 8, he called Assistant Attorney General Linda Willard and advised that El-Tabech would file a motion to enforce the attorneys' fee judgment and seek additional compensation for failure to pay because counsel "had not received any response to our prior requests for payment." After the State Claims Board advised Willard it had not received a claim requesting payment, she promptly advised counsel that, under Nebraska law, the judgment could not be paid without approval of a claim by the Claims Board and the Legislature, and that the Department of Correctional Services legal staff would promptly endorse a request for payment. The affidavit further averred that counsel's law firm operates under a line of credit that exceeds the amount of the May 5 judgment and accrues interest at the rate of five percent per year.

Contrary to counsel's affidavit, time sheets kept by El-Tabech's attorneys include the following entry dated June 13, 2008:

-3-

Correspondence from Neb. Dept. of Risk Management re: filing of claim for payment of judgment for attorney's fees. Research re: effect of filing of claim for payment of attorney's fee judgment. Preparation of memorandum re: same. Preparation of claim for attorney's fees for State Claim Board.

An entry dated September 10, 2008, recorded: "Review and revise State Claims Board claim form for attorney's fees and costs." Yet no claim was filed. Instead, counsel spent 69.4 hours between September 10 and October 8 preparing a motion to preempt the State's payment statutes and procedures, an exercise they began in February 2008. These facts were not disclosed to the district court until the time sheets were filed in March 2009, some six weeks after the court issued its ruling based on defendants' alleged dilatory conduct.

The district court granted this motion in the order being appealed. Its description of the motion is significant:

> Plaintiff seeks an order directing the defendants to immediately issue a warrant payable to plaintiff's counsel to satisfy the May 5, 2008, judgment and also seeks an increase in the amount of post-judgment interest payable [on that] judgment to a rate deemed appropriate to insure the defendants' compliance with the court's order.

El-Tabech v. Clarke, Mem. & Order dated Feb. 4, 2009, at p.1. Explaining that "defendants' invocation of its lengthy claims procedure should not operate to the financial detriment" of attorneys awarded fees under § 1988, the court ordered:

> 1. Plaintiff's motion for relief under Fed. R. Civ. P. 69 or 70 (Filing No. 212) is granted.
>
> 2. Judgment is entered for interest in the amount of [$7,857.72] for the period from May 5, 2008 . . . to the date of this order.

-4-

3. Interest at the rate of 14% shall accrue on any outstanding judgment from the date of this order.

Id. at pp. 5-6. Defendants appeal paragraphs 1 and 3 of this order.

**A.  Paragraph 1.** Though the order is not explicit, we infer from the court's description of the motion that paragraph 1 ordered state officials "to immediately issue a warrant payable to plaintiff's counsel," contrary to the mandates of Neb. Rev. Stat. § 25-1806. The order explained: "to the extent that the Nebraska claims process that requires legislative approval and appropriation prior to the State's payment of a federal court judgment conflicts with the purposes underlying § 1983 (to compensate victims and deter future deprivations of federal constitutional rights), it is preempted by federal law." Id. at p. 3.

The touchstone of preemption analysis is whether Congress reflected in the federal law a "clear and manifest" intent to displace state law. That intent -

> may be explicitly stated in the statute's language or implicitly contained in its structure and purpose. In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law . . . .

Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quotation and citation omitted). In Felder v. Casey, 487 U.S. 131, 138 (1988), the Court held that § 1983 preempted a state notice-of-claim statute because it "conflicts in both its purpose and effects with the remedial objectives of § 1983" and therefore "stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (Quotation omitted.)  We applied that principle in preempting a state statute in Hankins v. Finnel, 964 F.2d 853, 861 (8th Cir.), cert. denied, 506 U.S. 1013 (1992), and the district court applied it in invalidating Neb. Rev. Stat. § 25-1806.

The first problem with El-Tabech's contention, as adopted by the district court, is that we are dealing with the enforcement of a federal court judgment, and Congress expressly declared its intent *not* to preempt state law in approving Rule 69(a)(1):

> A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution -- and in proceedings supplementary to and in aid of judgment or execution -- must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

As Congress surely knew, it has long been the general rule that property of a State is exempt from execution unless a statute otherwise provides. 33 C.J.S. Executions § 42 (2009); see Virginia v. West Virginia, 241 U.S. 531, 532 (1916). Nebraska follows that rule. See Sherard v. State, 509 N.W.2d 194, 198 (Neb. 1993); Madison County v. Sch. Dist. No. 2, 27 N.W.2d 172, 177 (Neb. 1947). When Congress has expressly declared the extent of preemption intended, principles of implied conflict preemption may not be applied. Cipollone, 505 U.S. at 517 and 531-32 (Blackmun, J., concurring). Thus, Rule 69(a), rather than supporting paragraph 1 of the district court's order, is strong evidence the court exceeded its preemption authority.

Even if the conflict preemption principles of Felder apply to the enforcement of a § 1988 attorneys' fee judgment, we "must inquire more deeply into the intention of Congress and the scope of the pertinent state legislation." Hankins, 964 F.2d at 861 (quotation omitted). Because the purposes and objectives of § 1983 are broad -- "compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law" -- its preemptive sweep is "considerable," but it is not unlimited. Beeks v. Hundley, 34 F.3d 658, 661 (8th Cir. 1994) (quotation omitted).

Congress enacted § 1988 to encourage enforcement of civil rights laws, like § 1983, through lawsuits by private parties. Missouri v. Jenkins, 491 U.S. 274, 283

n.6 (1989).  Jenkins held that the Eleventh Amendment does not bar enhancing a fee award to compensate for delayed payment.  Id. at 281-82.  In this case, the fee was enhanced in paragraphs 2 and 3 of the order, but paragraph 1 went much further, preempting a state statute prescribing procedures for the expenditure of state funds.  That is a function at the core of Nebraska's sovereignty.  In Hutto, the Court expressly cautioned that the Eleventh Amendment "may counsel moderation in determining the size of the award or in giving the State time to adjust its budget before paying the full amount of the fee."  437 U.S. at 692 n.18, citing Edelman v. Jordan, 415 U.S. 651, 666 n.11 (1974).  Here, the issue is preemption -- whether Congress reflected in § 1988 its "clear and manifest" intent to *entirely* preempt statutes such as Neb. Rev. Stat. § 25-1806.  We conclude the answer is no.

El-Tabech argues that the delay in the payment of an attorneys' fee award caused by the State's statutory payment procedures in all cases interferes with the purposes and objectives of § 1988.  The contention proves far too much.  Uncompensated delays in payment can of course discourage willing attorneys from representing § 1983 plaintiffs.  But Jenkins confirmed that courts have ample power to overcome that obstacle by compensating § 1988 judgment creditors for delays in payment.  The compensatory purposes of § 1983 do not justify preempting a statute of general applicability within an area of traditional state power when there is no indication the statute "was intended to frustrate § 1983 inmate plaintiffs, or to reduce the deterrent effect of § 1983 judgments."  Beeks, 34 F.3d at 662.[1]

---

[1]If state officials *refuse* to pay a federal judgment rendered in a § 1983 civil rights action, the federal court confronts a far more difficult remedial problem.  That was the situation faced in the cases on which El-Tabech primarily relies, Gary W. v. Louisiana, 622 F.2d 804, 806-07 (5th Cir. 1980), cert. denied, 450 U.S. 994 (1981), and Gates v. Collier, 616 F.2d 1268, 1270-71 (5th Cir. 1980).  Even in that situation, while an order to pay is clearly appropriate, how to enforce that order if state officials remain recalcitrant and state law bars execution against state assets raises competing issues of supremacy and comity that happily are not present in this case.  Cf. Spain v. Mountanos, 690 F.2d 742, 745-47 (9th Cir. 1982).

El-Tabech argues that the MCA conflicts with § 1988 because it authorizes state officials to modify or reject a federal judgment and because the broad release provision in § 81-8,301 forces successful plaintiffs to release valid claims against the State to obtain payment of their federal judgment. But these contentions are not ripe for review. The only issue presented in this case is whether the Nebraska Legislature violated the Supremacy Clause when it enacted § 25-1806 and the MCA. If the Claims Board or the Legislature should ever reject a claim submitted to enforce a § 1988 fee award, contrary to a federal court judgment, that specific executive or legislative action would almost surely be conflict preempted. Likewise, serious Supremacy Clause issues would be raised if a state official ever argued that the MCA's claims-release provision imbued the State's payment of a particular federal judgment with greater preclusive force than it would be given under federal law. But the theoretical possibility of future disputes is not grounds for invalidating the statute. In Hankins, we carefully held that "section 1983 preempts the Missouri Incarceration Reimbursement Act *as it is applied in this case*." 964 F.2d at 861 (emphasis added).

For these reasons, paragraph 1 of the February 4, 2009, order is reversed.

**B. Paragraph 3.** Turning to paragraph 3 of the February 4, 2009, order, defendants argue the district court abused its discretion by increasing the post-judgment interest rate on the May 2008 fee award to a punitive 14% absent clear and convincing evidence of a failure to comply with the underlying order. "A district court may take any reasonable action to secure compliance with its orders, and only when the district court's response is so inappropriate as to amount to an abuse of discretion will the Court of Appeals intervene." Ass'n for Retarded Citizens v. Olson, 713 F.2d 1384, 1396 (8th Cir. 1983). Thus, the district court's authority to impose this form of compensatory remedy is clear. However, we find two flaws in the court's exercise of its discretion.

-8-

First, in Olson, we affirmed the district court's award of 14% *prejudgment* interest on an interim attorneys' fee award the State had neither appealed nor paid. We concluded that this award, entered in lieu of holding state officials in contempt, was a reasonable exercise of the court's discretion "to secure compliance with its orders." 713 F.2d at 1396. Here, on the other hand, (i) most of the delay prior to February 4, 2009, was attributable to El-Tabech's refusal to file a claim under the MCA, and (ii) the district court imposed a punitive 14% prospective interest rate to coerce the State into abandoning a statutory payment procedure that is *not* preempted by § 1983 or § 1988. In these circumstances, paragraph 3 cannot be affirmed.

Second, the prejudgment interest upheld in Olson is "considered part of the compensation due plaintiff" and may be awarded by the trial court after considering "a number of factors." Osterneck v. Ernst & Whinney, 489 U.S. 169, 175-76 (1989). Here, the issue is post-judgment interest. Congress has declared the post-judgment rate that adequately compensates federal judgment creditors:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. 28 U.S.C. § 1961(a).[2]

In enacting this statute, Congress determined that adequate compensation for the delay in paying a federal judgment is the interest a conservative investor would have earned, not the interest paid by a judgment creditor who borrowed funds while awaiting payment. Though we do not preclude the possibility that extraordinary circumstances

[2]"The phrase 'any money judgment' in section 1961(a) is construed as including a judgment awarding attorneys' fees." Jenkins v. Missouri, 931 F.2d 1273, 1275 (8th Cir.), cert. denied, 502 U.S. 925 (1991); see Wright, Miller & Cooper, Federal Practice & Procedure: Jurisd. § 3983, at 455 (3d ed. 2008).

might justify a court increasing the rate prescribed in § 1961(a) to make its § 1988 award adequately compensatory under Jenkins and Olson, the district court abused its discretion in this case by departing from the § 1961(a) rate where no such circumstances were shown.

For these reasons, paragraph 3 of the order was an abuse of the district court's remedial discretion. We remand for determination of an appropriate compensatory post-judgment interest rate, which is presumptively the § 1961(a) rate.

## II. The Supplemental Attorneys' Fee Award (No. 09-2691)

After the district court granted the contempt motion in part, El-Tabech moved for a supplemental award of $73,360.20 in attorneys' fees. In support, he submitted detailed time sheets showing that his attorneys deducted $15,360.60 for time spent on unsuccessful issues. The district court granted the entire amount requested, concluding that El-Tabech demonstrated that he only sought compensation for "the issue on which he was successful -- the kosher diet issue" -- and that the hourly rate and time spent on enforcing the previous fee award, the contempt motion, and the present fee application were "reasonable in light of the defendants' conduct." Defendants appeal this award, arguing that El-Tabech did not fully deduct time spent on unsuccessful or non-compensable issues, that his attorneys spent an unreasonable amount of time on compensable aspects of the case, and that the requested fee was not proportional to the relief obtained. We agree.

In § 1983 actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). When plaintiff initially prevails and obtains injunctive relief in "institutional reform" litigation, some types of post-judgment activities are generally compensable as "necessary adjuncts to the initial litigation, whereas other types of activities are more like a new, separate lawsuit and require a fee determination

-10-

independent of the underlying case." Jenkins v. Missouri, 127 F.3d 709, 716-17 (8th Cir. 1997). Reasonable fees for defending the injunction from attack are compensable, but "[a] prevailing party who aggressively seeks a greater victory and fails is entitled to a proportionally lesser fee award than a prevailing party who merely defends [his] victory, even if the defense is less than completely successful." Ass'n for Retarded Citizens v. Schafer, 83 F.3d 1008, 1012 (8th Cir.), cert. denied, 519 U.S. 993 (1996). Work that is more like a new, separate lawsuit "requires a fresh determination of entitlement to fees." Cody v. Hillard, 304 F.3d 767, 773 (8th Cir. 2002). In all events, "hours that are excessive, redundant, or otherwise unnecessary" must be excluded. Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).

El-Tabech divided his supplemental application into categories of post-judgment work. He requested and was awarded $15,780.60 for time spent enforcing the original attorneys' fee award; $14,837.40 for time spent monitoring defendants' compliance with the original court order; $32,019.60 for time spent briefing and arguing the contempt motion; and $10,722.60 for time spent on the fee requests. El-Tabech "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437.

**A.  Enforcing the original attorney fee award.**  As we have explained, the time sheets belatedly submitted by El-Tabech's attorneys reveal lack of candor and excessive time spent in submitting his motion to enforce the original fee award. Even more to the point, the motion was entirely unsuccessful. Though defendants did not appeal paragraph 2, the district court will need to reconsider paragraph 2 in determining on remand what compensatory post-judgment interest rate is appropriate. Therefore, the award of fees for time spent on the issues resolved in Part I of this opinion is reversed.

**B. Post-Judgment Monitoring.** El-Tabech's attorneys recorded 108.7 hours monitoring defendants' compliance with the Kosher Process, requesting $14,837.40

for that time. We ruled in <u>Jenkins</u> that monitoring compliance with court orders and enforcing the remedy "are generally compensable as part of the underlying case." 127 F.3d at 717. However, we noted in <u>Cody</u>, 304 F.3d at 777, that Congress in the Prison Litigation Reform Act (PLRA) explicitly disallowed an award of fees for post-judgment monitoring by providing that a fee may only be awarded if "the fee was directly and reasonably incurred in *enforcing* the relief ordered for the violation." 42 U.S.C. § 1997e(d)(1)(B)(ii) (emphasis added).[3] As the district court did not apply the PLRA limitation, this part of the award cannot be affirmed. In addition, El-Tabech's attorneys devoted 72 hours to monitoring all aspects of TSCI's food quality and service, whereas the injunction only ordered defendants to *implement* the stipulated Kosher Process to provide El-Tabech "a nutritionally-sufficient kosher diet." Thus, much of the monitoring was work on a new, unsuccessful lawsuit.

**C. Motion for contempt.** The district court awarded $32,019.60 for work performed on the motion for contempt. The court partially granted the motion because defendants "have not shown that they have made all reasonable good-faith efforts to comply with court's order" to provide kosher food.

On March 5, 2008, El-Tabech's attorneys arranged for and accompanied a rabbi's tour of TSCI to evaluate the defendants' compliance. Rabbi Jonathan Gross reported in a letter to counsel "that the food prepared as prescribed by the protocol and based on my personal observations is kosher according to the highest standards," and that "prison kitchen staff is being needlessly stringent." This was compensable time spent in enforcing the injunction. However, Rabbi Gross reported that defendants had

---

[3]The PLRA also provides that no injunction shall be granted "in any civil action with respect to prison conditions . . . unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1); <u>see</u> <u>Castillo v. Cameron County</u>, 238 F.3d 339, 351-55 (5th Cir. 2001).

implemented a Kosher Process to provide El-Tabech a nutritionally-sufficient kosher diet.

On April 15, 2008, El-Tabech discovered feces wrapped in plastic in a vegan entree prepared and delivered by TSCI staff. He filed an emergency grievance and advised his attorneys. TSCI suspended service of staff-prepared kosher meals while the incident was investigated, serving only kosher items that were factory sealed or still in their "own skin." On May 13, TSCI modified Food Service Protocol 1.02 to reduce staff access to kosher meals during preparation and delivery and to provide "a clear delineation of responsibilities and oversight to prevent a similar incident." On May 15, El-Tabech was first served an entree under the modified Protocol. His August 6, 2008, affidavit submitted in support of the contempt motion relates:

> I immediately felt nauseous and nearly vomited. Since May 15, 2008, I have refused to accept the vegan entrees, and continued refusing any food handled directly by TSCI staff that is not prepackaged or still in its skin.

At this point, El-Tabech's attorneys had all the information needed to obtain the relief granted by the court's March 4, 2009, order -- modifying the injunction to require defendants to provide only prepackaged kosher foods. Yet El-Tabech did not file the motion for contempt until late August. In the interim, the time sheets record many hours revising the motion papers. In total, El-Tabech's attorneys recorded 141.5 hours drafting the brief in support of this motion, 67.7 hours drafting the reply brief, and 23.8 hours preparing for and attending the motion hearing. Though we review the amount awarded for compensable post-judgment work under a deferential abuse-of-discretion standard, see Jenkins, 127 F.3d at 716-19, this seems to us like an unreasonable and unnecessary amount of time to spend on the successful portion of the motion and may include hours spent on issues other than whether El-Tabech was reasonably demanding prepackaged foods. The district court should again review this portion of the award on remand.

-13-

In determining whether a fee award is reasonable and necessary, the key component is the "exclusion of 'hours that are excessive, redundant, or otherwise unnecessary.'" Schafer, 83 F.3d at 1012, quoting Hensley, 461 U.S. at 434. The degree of plaintiff's success is "the most critical factor" in selecting a reasonable fee award. Warnock v. Archer, 397 F.3d 1024, 1026 (8th Cir. 2005), quoting Farrar v. Hobby, 506 U.S. 103, 114-15 (1992). Here, it appears that "the complexity of the issues [on which El-Tabech was successful] simply did not warrant the requested amount of 'lawyering.'" Quigley v. Winter, 598 F.3d 938, 958 (8th Cir. 2010).

**D. The fee applications.** The district court awarded El-Tabech $10,722.60 for 77.7 hours spent preparing the reply brief in support of the original motion for attorney's fees and the motion for supplemental attorneys' fees. Time spent preparing fee applications is generally compensable, but here the time was excessive to prepare an application for the portions of the requests that were properly compensable.

## III. Conclusion

When a fee award is not upheld, the appropriate disposition of the appeal is usually to remand. See Quigley, 598 F.3d at 958. That is appropriate in this case, particularly because other fee and fee payment issues may not be entirely resolved. Accordingly, in both cases, we remand to the district court for further proceedings not inconsistent with this opinion.

_____