**Robin HENSEL, Plaintiff,**

v.

**CITY OF LITTLE FALLS,
MN, Defendant.**

**Civ. No. 12–1160 (RHK/LIB).**

United States District Court,
D. Minnesota.

Jan. 8, 2014.

Larry A. Frost, Paladin Law, PLLC, Bloomington, MN, Bruce Fein, Bruce Fein & Associates, Inc., Washington, D.C., for Plaintiff.

Paul D. Reuvers, Jason J. Kuboushek, Stephanie A. Angolkar, Iverson Reuvers Condon, Bloomington, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

RICHARD H. KYLE, District Judge.

### INTRODUCTION

In this First Amendment case, Plaintiff Robin Hensel challenges two ordinances enacted by Defendant City of Little Falls, Minnesota (the "City"). Presently before the Court are the parties' cross-Motions for Summary Judgment. For the reasons that follow, the Motions will be granted in part and denied in part.

### BACKGROUND

#### I. The "old sign ordinance" and the "old bench ordinance"

The City is a small community of approximately 8,000 residents, located about 100 miles northwest of Minneapolis. It has had an ordinance (City Code § 5.30) restricting, among other things, the number, size, and location of residential yard signs since sometime prior to 2008. (Myers Dep. at 34; Kasella Aff. ¶ 2 & Ex. 1.) That year, the City decided to update its "outdated" ordinance in light of an "explosion" of electronic signage. (Myers Dep. at 34.) The City's planning commission reviewed several drafts of a new ordinance and was still in the process of revisions when the events at issue in this lawsuit first transpired. (Id. at 35–36; Kasella Aff. ¶¶ 4, 7–8.)

Similarly, for many years the City has had in place an ordinance (City Code § 5.33) granting rights to an outside entity (JMR2 Investments ("JMR2")) to place "advertising benches" in "nonhistoric areas" of the City, on a portion of the public right-of-way "between the curb and the property line." (Kasella Aff. Exs. 13, 23.) Potential advertisers are required to pay a $400 fee to JMR2 in order to advertise on a bench (Hensel Dep. at 116), and the City and JMR2 share the revenue (Kasella Aff. Ex. 23, § 10). Both the bench ordinance and the City's contract with JMR2 granted the City the right to approve the "size, form, *wording*, illustration, and style" of all bench advertisements and reserved to the City the right to reject an advertisement for any (or no) reason. (Id. Ex. 13, § 5.33.F (emphasis added); accord id. Ex. 23, § 7(a).)

## II. Hensel's yard signs and her attempts to place an advertising bench

### A. Yard signs

Hensel is a long-time resident of the City. In September 2011, she posted a plethora of signs in her yard, along the side of a main City road, supporting the "Occupy Wall Street" movement and similar political themes. (Hensel Dep. at 39–40; Lochner Aff. Ex. 2; 3rd Am. Compl. ¶ 11.)[1] At the time, the sign ordinance permitted only one sign per residence, not exceeding two square feet in size. (See Lochner Aff. Ex. 1.) It is undisputed the City received complaints about Hensel's signs, including at least one in which the complainant asserted that the signs had nearly caused a traffic accident. (Lochner Aff. ¶ 4; Kasella Dep. at 45–46; 3rd Am. Compl. ¶ 13.) Accordingly, the City sent Hensel a letter, dated November 9, 2011, advising that her signs violated the sign ordinance and had to be removed by November 18. (Lochner Aff. Ex. 1.)

Hensel responded by adding "seasonal motifs" to her signs, in an attempt to "shoehorn" them into the ordinance's exception for "temporary seasonal or religious displays." (Lochner Aff. Exs. 3–4; 3rd Am. Compl. ¶ 16.) On November 28, 2011, the City informed her that she remained in violation of the ordinance and that "all but two (2) square feet of signage that is not seasonal or religious must be removed." (Lochner Aff. Ex. 3.) The letter further noted that the City's police department had been provided a copy thereof and would issue a ticket if the signs were not removed before December 5. (Id.) At that point, Hensel removed nearly all of her signs and placed many on her van, which she parked in "predominant" parts of the City. (Hensel Dep. at 58, 113–14.) Eventually, however, she decided that she would not comply with the City's demands, and she began placing "more and bigger" signs on her property. (Id. at 58–60.)

In January 2012, Hensel observed a banner hanging in downtown Little Falls that said "We Support Our Troops." (Id. at 76–81.) She complained to the City that the banner was illegal under the sign ordinance. (Id.; Lochner Aff. ¶ 12; Kasella Aff. Ex. 11.) On January 17, 2012, the City Council discussed the ordinance and, on the advice of the City's attorney, Antoinette Wetzel, decided to suspend its enforcement until a new ordinance could be enacted. (Kasella Aff. Exs. 8, 36; Lochner Aff. ¶ 11.) Hensel then displayed yard signs of various sizes and colors over the ensuing months.

### B. Advertising bench

On March 26, 2012, Hensel wrote the City and requested to place an advertising bench at a location adjacent to City Hall. (Kasella Aff. Ex. 15.) A bench previously existed at that location but had been removed after it was vandalized and broken. (Id. Exs. 16, 22; Hensel Dep. at 116.) The City responded by informing Hensel that she should contact JMR2, and the company, in turn, wrote the City and indicated that it had "received a request from a potential customer for that location . . . to set a bench." (Kasella Dep. Ex. 16.)

The City Council discussed JMR2's request at a "work session" on April 2, 2012, at which Hensel and Wetzel were present. (Id. Ex. 18.) Wetzel indicated she thought the City's bench ordinance needed to be revised in order to remove the provision

---

1. Occupy Wall Street "is a 'leaderless resistance movement' generally protesting Wall-Street and corporate 'greed.'" *Occupy Minne-apolis v. Cnty. of Hennepin*, 866 F.Supp.2d 1062, 1065 n. 1 (D.Minn.2011) (Kyle, J.) (citation omitted).

granting the City the right to review an advertisement's wording before a bench could be placed. (*Id.*) Accordingly, she informed the Council that it should decide whether to approve the application solely based on the bench's proposed location. (*Id.*) In their subsequent discussions, Council members indicated that they did not believe a bench was appropriate at the proposed location, but they nevertheless placed the matter on the "formal agenda" for the City Council's next "regular meeting" on April 16, 2012. (*Id.*)

At that April 16, 2012 meeting, several Council members expressed concerns that (1) the bench previously placed at the desired location had caused line-of-sight problems for passing motorists and (2) a bench in such close proximity to City Hall could be viewed as City endorsement of the bench's message. (Reuvers Aff. Ex. 9.) The City Council then voted to deny the bench application. (Kasella Aff. Ex. 20.)

### III. The City enacts the "new sign ordinance" and the "new bench ordinance" after Hensel sues

Meanwhile, during late 2011 and early 2012, the City considered several drafts of a new sign ordinance. Among other things, the City's planning commission (1) consulted with the League of Minnesota Cities regarding proposed content, (2) reviewed a sign ordinance recently enacted in another nearby community, and (3) reviewed sign complaints the City had received from its residents. The commission also held several public meetings at which comments were offered and considered, including about the effects of signs on traffic safety, property values, and community aesthetics. Commission members and

other City officials also used "common sense" regarding the effects of the proliferation of signs and considered comments they had received individually. (*See, e.g.,* Lochner Dep. at 32–41; Kasella Dep. at 29–30, 35; Myers Dep. at 31, 46–48, 63–64; Burggraff Dep. at 17; Van Risseghem Dep. at 18–21, 49, 53; Kasella Aff. Exs. 3–5, 8.)

Despite enforcement of the sign ordinance having been halted while a new sign ordinance was being drafted, on May 14, 2012, Hensel sued the City, alleging *inter alia* that the old sign ordinance was facially unconstitutional and that the City's enforcement of the ordinance had deterred her from exercising her free-speech rights.[2] She sought damages, a judgment declaring the old sign ordinance unconstitutional, an injunction prohibiting its enforcement, and an award of attorneys' fees and costs.

Then, on July 2, 2012, the City enacted a new sign ordinance. (Kasella Aff. Exs. 6–7.) In its preamble, the new ordinance provides that the City Council had determined signs have a "substantial impact on the character and quality of the environment" and can create traffic hazards, aesthetic concerns, and detriments to property values. (*Id.* Ex. 2, § 5.30.I.A.) The ordinance's stated "purpose and intent" is to "[r]egulate the number, location, size, type, illumination and other physical characteristics of signs . . . in order to promote the public health, safety and welfare," and to "[m]aintain, enhance and improve the aesthetic environment of the City by preventing visual clutter" and "[i]mprov[ing] the visual appearance of the City." (*Id.* § 5.30.I.B.)

---

2. Hensel also asserted a claim regarding access to public parks, and named several City officials (and "John Does") as Defendants, but later agreed to dismiss those claims and Defendants.

The new ordinance requires a permit for any sign erected in the City unless falling within an enumerated exception. (*Id.* § 5.30.II.A, B.) One such exception is that two signs, totaling eight square feet, may be erected without a permit on any City property zoned "residential." (*Id.* § 5.30.-II.B.1.) For a sign requiring a permit, an application must be submitted indicating the name and address of the property owner, the location of the proposed sign on the property, and other similar information. (*Id.* § 5.30.II.A.) However, "[t]he content of the sign shall not be reviewed or considered in determining whether to approve or deny a sign permit." (*Id.*)

At the same time the City revised the sign ordinance, it also revised the bench ordinance. (*See* Kasella Aff. Ex. 14.) Though largely tracking the language of the old bench ordinance, the new bench ordinance removed the provisions entitling the City to (i) review a proposed advertisement's "wording" before being approved and (ii) reject any proposed advertisement it saw fit. (*Id.*) The City retained the right, however, to review and approve the "location and placement" of advertising benches. (*Id.*)

## IV. Hensel amends her Complaint

Two weeks after the new sign ordinance was enacted, the City Council passed a resolution directing City staff to begin enforcing it. (*Id.* Ex. 8.) However, at that time the new ordinance was temporarily (and partially) preempted by state law.[3] Accordingly, Hensel continued posting numerous signs in her yard without any interference from the City.

In December 2012, however, she received a citation from the City for having an excessive number of yard signs. (Hensel Dep. at 71.) In response, she covered up all signs but two, totaling eight square feet, as allowed without a permit under the new sign ordinance. (*Id.*) The citation was then withdrawn. (Schirmers Dep. at 13–14; Hensel Dep. at 74.) The parties have not indicated whether any other enforcement action has been taken against Hensel under the new sign ordinance, and it is unclear whether she continues displaying signs on her property and, if so, how many. Nor is there any indication that she has sought to place an advertising bench since her initial attempt was rejected under the old sign ordinance in April 2012.

Nevertheless, the amendments to the sign and bench ordinances caused Hensel to amend her Complaint in this action several times in 2012 and 2013. Her currently operative pleading, the Third Amended Complaint (Doc. No. 77), alleges that both the old and new sign ordinances, and both the old and new bench ordinances, violate the First Amendment in several ways, for which she seeks injunctive relief, damages, and attorneys' fees and costs. The parties have undertaken copious discovery lasting more than a year and now cross-move for summary judgment. Their Motions have been fully briefed and are ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue

---

**3.** In 2012, Minnesota Statutes § 211B.045 provided, in an election year, that "[i]n any municipality, whether or not the municipality has an ordinance that regulates the size or number of noncommercial signs, all noncommercial signs of any size may be posted in any number from 46 days before the state primary ... until ten days following the state general election." As 2012 was an election year, the statute preempted the City's restrictions on yard signs between June 29, 2012 (46 days before the August 14, 2012 primary) and November 16, 2012 (ten days after the November 6, 2012 general election).

as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Ricci v. DeStefano,* 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir.2011) (*en Banc* ); *Whisenhunt v. Sw. Bell Tel.,* 573 F.3d 565, 568 (8th Cir.2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *Beard v. Banks,* 548 U.S. 521, 529–30, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *Weitz Co., LLC v. Lloyd's of London,* 574 F.3d 885, 892 (8th Cir.2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed.R.Civ.P. 56(c)(1)(A); *Wood v. SatCom Mktg., LLC,* 705 F.3d 823, 828 (8th Cir.2013).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering Hensel's Motion, the Court views the record in the light most favorable to the City, and when considering the City's Motion, the Court views the record in the light most favorable to Hensel. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." *Seaworth v. Messerli,* Civ. No. 09–3437, 2010 WL 3613821, at *3 (D.Minn. Sept. 7, 2010) (Kyle, J.), *aff'd,* 414 Fed.Appx. 882 (8th Cir.2011) (*per curiam* ).

## ANALYSIS

### I. First Amendment law generally

█ The Free Speech Clause of the First Amendment provides that "Congress shall make no law … abridging the freedom of speech," U.S. Const. amend. I, a restriction that is also applicable "to the political subdivisions of the states," *Whitton v. City of Gladstone,* 54 F.3d 1400, 1402 (8th Cir.1995). However, the First Amendment does not guarantee "the right to communicate one's view at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Members of City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("It has been clear since this Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech."). Notably, while signs are a form of expression entitled to First Amendment protection, they " 'pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation.' " *Whitton,* 54 F.3d at 1402–03 (quoting *City of Ladue v. Gilleo,* 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994)). A city, therefore, may validly enact ordinances regulating the time, place, and manner signs may be erected therein. *Id.*[4]

█ To evaluate the constitutionality of a municipality's sign regulation, the Court applies a "familiar framework." *Id.* at 1403. It first determines "whether [the] regulation is content-based or content-neutral, and then, based on the answer to that question, … appl[ies] the proper level of scrutiny.' " *Id.; accord, e.g., Neighborhood Enters., Inc. v. City of St. Louis,* 644 F.3d

---

**4.** Although the Court discusses general legal principles vis-a-vis signs, the same principles apply to advertising benches, and the parties do not contend otherwise.

728, 736 (8th Cir.2011). A sign ordinance is content-based rather than content-neutral when "the message conveyed determines whether the speech is subject to restriction." *Id.; accord, e.g., Hill v. Colorado,* 530 U.S. 703, 720, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Content-based ordinances are subject to strict scrutiny and "presumptively violate" the First Amendment, *City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 46, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), while content-neutral ones receive "intermediate scrutiny," *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), meaning they pass muster only if they are "narrowly tailored to serve a significant government interest, and ... leave open ample alternative channels for communication," *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The City bears the burden of establishing that the ordinances in question are lawful. *E.g., United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

With these general principles in mind, the Court addresses in turn Hensel's challenges to the sign and bench ordinances.

## II. The sign ordinance

While the Third Amended Complaint is not a model of clarity, Count I clearly asserts claims regarding *both* the old *and* new sign ordinances. (*See* 3rd Am. Compl. ¶ 36 (noting Count I "applies to the New [sign] Ordinance generally, and to the Old [sign] Ordinance for the purposes of establishing damages flowing from [it]").) But while Hensel purports to seek summary judgment on that claim (and all of her others), she makes *no argument whatsoever* regarding the old sign ordinance in her moving brief. By the same token, the City has asked for summary judgment on *all* of Hensel's claims, including her claim under the old sign ordinance. (*See* Def. Mem. in Supp. at 20–22.) Yet while Hensel's opposition to the City's Motion *mentions* the old sign ordinance, it does not actually address that ordinance or the City's arguments regarding it. (*See* Pl. Mem. in Opp'n at 9–25.) For these reasons, the Court assumes at this juncture that Count I relates only to the new sign ordinance.[5] And for the reasons that follow, Hensel's claim regarding that ordinance fails.

### A. The ordinance is content-neutral

■ As noted above, the Court must first determine whether the new sign ordinance is content-based or content-neutral, in order to determine the level of scrutiny to which the ordinance is subject. "The principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of disagreement with the message the speech conveys." *Iowa Right to Life Committee,*

---

**5.** To be clear, the Court is not determining the City is entitled to judgment as a matter of law on the *merits* of Hensel's claim under the old sign ordinance. *See Interstate Power Co. v. Kan. City Power & Light Co.,* 992 F.2d 804, 807 (8th Cir.1993) ("Even if a motion for summary judgment on a particular claim stands unopposed, the district court must still determine that the moving party is entitled to judgment as a matter of law on that claim."). Rather, the Court has determined that by failing to respond to the City's arguments regarding the old sign ordinance, and by further failing to address that ordinance in her own Motion (despite purporting to move for summary judgment on all of her claims), Hensel has abandoned any claim regarding it. *See Niobrara River Ranch, L.L.C. v. Huber,* 373 F.3d 881, 882 n. 1 (8th Cir.2004) (affirming dismissal of claim that plaintiff "did not brief" below, resulting in "the district court deem[ing] the claim abandoned").

*Inc. v. Tooker,* 717 F.3d 576, 602 (8th Cir.2013) (citations omitted). Laws that "impose burdens on speech without reference to the idea or views expressed are in most instances content neutral." *Turner Broad.,* 512 U.S. at 643, 114 S.Ct. 2445; *accord, e.g., Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (ordinance aimed at accomplishing purposes "unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others"). That is true here.

The new sign ordinance imposes burdens on speech by limiting the *number* and *size* of signs that may be erected in the City, in an (ostensible) effort to protect property values, prevent distractions for drivers, and avoid aesthetic clutter, but it is silent as to ideas, views, or content. Indeed, the ordinance expressly provides that a resident may post two signs without a permit and additional signs with one, and "[t]he content of [a] sign *shall not be reviewed or considered* in determining whether to approve or deny a sign permit." (Kasella Aff. Ex. 2, § 5.30.II.A (emphasis added).) Nothing in the ordinance remotely suggests "disagreement with the message[s] [that might be] convey[ed]" on signs posted within the City. *Iowa Right to Life,* 717 F.3d at 602. On its face, therefore, the ordinance is content-neutral. *See also, e.g., Peterson v. City of Florence,* 727 F.3d 839, 842 (8th Cir.2013) (*per curiam*) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral."); *Mo. ex rel. Nixon v.*

*Am. Blast Fax, Inc.,* 323 F.3d 649, 659–60 (8th Cir.2003) (law content-neutral where legislature's concern was "not ... with the effect of the content of the advertisements, but rather with the effect of the act of communicating").

Hensel argues that the new sign ordinance is content-based because it "favor[s] commercial over non-commercial speech," since it (allegedly) permits more, and larger, signs in business districts than in residential districts. (*See* Pl. Mem. in Opp'n at 9–11.)[6] But even if true, this does not render the ordinance content-based. Indeed, while the ordinance may well permit additional signage in business districts, it says nothing about the *content* of that signage—properties located within business districts may choose to display either commercial or non-commercial speech. The ordinance, in fact, contains a "substitution clause" providing that non-commercial speech may be substituted for commercial speech on any sign otherwise permitted. (Kasella Aff. Ex. 2, § IX.A ("The purpose of this provision is to prevent any inadvertent favoring of commercial speech over non-commercial speech, or favoring of any particular non-commercial message over any other non-commercial message.").)

■ In any event, it is not *per se* improper to treat commercial speech and noncommercial speech differently, as "they are afforded different degrees of protection" under the First Amendment. *Clear Channel Outdoor, Inc. v. City of St. Paul,* Civ. No. 02–1060, 2003 WL 21857830, at *5 (D.Minn. Aug. 4, 2003) (Frank, J.); *see*

---

6. Hensel purports to cite the new sign ordinance to bolster her argument, but her citations are indecipherable. For instance, she points to sections "E.1.a" and "E.1.c" (*see* Pl. Mem. in Opp'n at 11 n. 2), but no such sections exist. (*See also id.* at 10 (citing "§ D.5.a").) Rather, the ordinance is divided into ten sections, each labeled with a Roman numeral from I through X, which are then further subdivided into lettered and numbered subparts. (*See* Kasella Aff. Ex. 2; Frost Aff. Ex. R.) Despite its best efforts, the Court has been unable to align Hensel's citations with the (supposedly) designated sections of the new sign ordinance.

*also City of Ladue,* 512 U.S. at 51 n. 10, 114 S.Ct. 2038 ("[N]ot every law that turns on the content of speech is invalid."); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 568, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (Burger, C.J., dissenting) ("By allowing communication of certain commercial ideas via billboards, but forbidding noncommercial signs altogether, a city does not necessarily place a greater 'value' on commercial speech."). Before enacting the new sign ordinance here, the City Council noted, in business districts, that signs are more expected by passers-by and traffic is better controlled with stoplights and crosswalks than in residential areas. (*See* Boyum Dep. at 55–56.) When enacting the ordinance, the City indicated that it was intended to "[a]llow a wide variety of sign types in commercial zones[ ] and a more limited variety of signs in other zones," in order to "promote the economic viability of the community[ ] while protecting ... the aesthetics ... and health, safety, and welfare" of the City. (Kasella Aff. Ex. 2, § 5.30.II.B, C.) Therefore, the City has proffered a basis for permitting more (and bigger) signs in commercial versus noncommercial zones that is relevant to the interests the ordinance purports to serve and does not focus on the signs' content. *See Am. Blast Fax,* 323 F.3d at 655 (statute's different treatment of commercial speech from non-commercial speech valid where distinction was "relevant to the asserted governmental interest"); *see also Metromedia,* 453 U.S. at 567, 101 S.Ct. 2882 (Burger, C.J., dissenting) ("When a city chooses to impose looser restrictions in one area than it does in another analogous area—even one in which the Constitution more narrowly constrains legislative discretion—it [does not] undermine[ ] the constitutionality of its regulatory scheme.").

Because the new sign ordinance is content-neutral, the Court applies intermediate scrutiny, meaning it passes muster if it is "narrowly tailored to serve a significant government interest, and ... leave[s] open ample alternative channels for communication." *Clark,* 468 U.S. at 293, 104 S.Ct. 3065. For the reasons that follow, the new sign ordinance clears these hurdles.

**B. The new sign ordinance is narrowly tailored to serve significant government interests**

It cannot seriously be disputed that the ills (allegedly) sought to be cured by the ordinance—visual clutter, diminished property values, and traffic hazards—are significant government interests. *See, e.g., Metromedia,* 453 U.S. at 507–08, 101 S.Ct. 2882 ("[T]he twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial governmental goals."); *Neighborhood Enters.,* 644 F.3d at 737–38 ("[A] municipality's asserted interests in traffic safety and aesthetics [are] significant."); *Pleasureland Museum, Inc. v. Beutter,* 288 F.3d 988, 1002 (7th Cir.2002) (significant government interests in "combat[ting] urban blight and ... prevent[ing] a decline in the value of ... properties"). Indeed, Hensel herself recognizes that at least one of these aims, traffic safety, is "a significant government interest." (Pl. Mem. in Opp'n at 15.) [7]

---

7. Hensel notes aesthetics are "in the eye of the beholder" and, hence, contends there is no way to "prevent an official concern with aesthetics from being employed as a smokescreen to suppress disliked speech." (Pl. Mem. in Opp'n at 20.) But accepting her argument would mean that aesthetics could *never* constitute a significant government interest, contrary to well-established law. *See, e.g., Metromedia,* 453 U.S. at 507–08, 101 S.Ct. 2882; *Neighborhood Enters.,* 644 F.3d at 737–38.

■ The more complicated question is whether the new sign ordinance is "narrowly tailored" to serve these interests. According to Hensel, the City cannot make this showing because it has failed to conduct studies or marshal evidence showing that the proliferation of lawn signs actually causes the problems the ordinance (allegedly) is intended to address. With respect to traffic safety, for example, she argues that the City has failed to "provide evidence that ... yard signs cause traffic hazards." (Pl. Mem. in Supp. at 6–7; *accord, e.g.*, Pl. Mem. in Opp'n at 14 (The City "has not ... provided this [C]ourt with a scintilla of admissible evidence that [the] alleged government purpose [of improving] traffic safety [ ] is real.").) And she claims that the City "could have easily gathered factual evidence [showing] accidents [were] caused by yard signs," but did not do so. (Pl. Mem. in Opp'n at 16.) "In sum," she contends, "the record is undisputed that [the City] asserts nothing but a speculative possibility that signs may be somehow linked to traffic accidents," and she raises similar contentions with respect to property values and aesthetics. (*Id.* at 18–21; *accord* Pl. Mem. in Supp. at 7 (arguing the City "has no evidence at all that yard signs ... drag down property values").) There are two problems with Hensel's argument.

First, while she is correct that the City could not support the ordinance with only *theoretical* harms, *see Turner Broad.*, 512 U.S. at 665, 114 S.Ct. 2445 ("When the Government defends a regulation on speech as a means to ... prevent anticipated harms, ... [i]t must demonstrate that the recited harms are real, not merely conjectural."), she wrongly contends the City marshaled *no* evidence indicating yard signs have the propensity to cause traffic accidents, reduce property values, or contribute to visual blight. For instance, Co–City Administrator Lori Kasella testified in her deposition that she received several complaints from residents about "slow traffic" and "near accidents" because of yard signs. (Kasella Dep. at 29.) The City's Mayor, Catherine Van Risseghem, received similar complaints. (Van Risseghem Dep. at 48–49, 53–54.) Van Risseghem also spoke with realtors working in the City about the negative effect of yard signs on property values, and at least one City resident expressed concerns about the ability to sell his property if signs were permitted unfettered. (*Id.* at 19, 52.) And, members of the City's planning commission and City Council also relied on their own personal experiences, including reduced vision and blocked sightlines caused by yard signs, and "common sense" to support the ordinance. (*See, e.g.*, Myers Dep. at 27–33.)

Hensel attacks this evidence as "hearsay" and uncorroborated, but these contentions lack merit.[8] (Pl. Mem. in Opp'n

---

8. Hensel's evidentiary objections are somewhat ironic given her submissions here; they call to mind the expression "the pot calling the kettle black." For example, she has submitted a plethora of "statements"—mostly her own, some from others—that are not notarized and are unsworn. (*See, e.g.*, Frost Aff. Exs. 4–8, 12–13.) These unsworn "statements" may not be considered at summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A) (requiring "affidavits or declarations"); 28 U.S.C. § 1746 (declaration requires person offering statement to "declare ... under penalty of perjury" that statement is correct); *Elder–Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir.2006) (no error in *sua sponte* excluding unsworn affidavits, as "[a]ffidavits are admissible in summary judgment proceedings [only] if they are made under penalties of perjury") (citation omitted). Similarly, at times she cites deposition transcripts *generally*, that is, without providing specific page numbers. (*See, e.g.*, Pl. Mem. in Opp'n at 15 (citing "Schirmers Dep." with no additional specificity); *id.* at 16 (same).) Yet, the Court is not required to sift through a transcript

at 15–19 & nn. 4–5.) Yard-sign complaints by City residents are not hearsay, because the City does not offer them for their truth. Rather, the complaints explain the City's *motivation* for enacting the new sign ordinance—the reasons why it acted—whether the complaints were accurate or not. *See* Fed.R.Evid. 801(c)(2) (hearsay is a statement "a party offers in evidence to prove the truth of the matter asserted in the statement"); *United States v. Worman,* 622 F.3d 969, 976 (8th Cir.2010) (statement not hearsay where offered to establish defendant's motive); *Johnston v. Centurylink, Inc.,* No. C11–5588, 2012 WL 5295147, at *5 (W.D.Wash. Oct. 26, 2012) ("It is well settled that evidence offered ... to show [a defendant's] motivation for [its conduct] is not hearsay because it is not offered for truth of the matter asserted."). Further, Hensel offers no support for the contention that the City was somehow obligated to *corroborate* the complaints before relying upon them.

■ This dovetails with the second reason Hensel's argument fails. While she apparently believes, before enacting regulations concerning yard signs, that a municipality must "gather[ ] factual evidence" or conduct studies showing a link between signs and their secondary effects (see Pl. Mem. in Supp. at 8–11; Pl. Mem. in Opp'n at 13–20), the Supreme Court has not imposed such an onerous burden. Rather, a municipality "may rely upon *any evidence* that is *reasonably believed* to be relevant for demonstrating a connection between speech and a substantial, independent government interest," which may simply include "common sense." *City of L.A. v. Alameda Books, Inc.,* 535 U.S. 425, 438–39, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (emphases added); *accord, e.g., Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 555, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) ("[W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even ... to justify restrictions based solely on history, consensus, and simple common sense.") (internal quotation marks and citation omitted).[9]

*City of Renton* is instructive. There, Renton had enacted a zoning law limiting the location of adult theaters, based upon a study conducted by *another* city (Seattle) about the secondary effects of such theaters and efforts to combat them through zoning. 475 U.S. at 50, 106 S.Ct. 925. The plaintiff challenged Renton's law on First Amendment grounds and the district court ruled in the city's favor, but the Ninth Circuit reversed, holding that because the law was enacted without studies specifically relating to "the particular problems or needs of Renton," the city's justifications were "conclusory and speculative." *Id.* at 50, 106 S.Ct. 925. The

hoping to find a page supporting an argument. *Rodgers v. City of Des Moines,* 435 F.3d 904, 908 (8th Cir.2006) (court need not "mine [the] summary judgment record searching for nuggets ... to gild [a party's] arguments"). And, Hensel's briefs often distort the evidence that *is* properly before the Court. As but one example, she contends that the City's police chief testified in his deposition "that in over twenty years' service, most of them in Defendant Little Falls, he had never seen an accident caused by a yard sign." (Pl. Mem. in Opp'n at 15.) But this is simply incorrect; the Chief testified that he

*could not recall* whether any accidents were caused by signs. (*See* Schirmers Dep. at 26 ("Q. But you don't specifically recall one [traffic accident] at this moment that was caused by a sign? ... A. *I can't say yes or no. I just don't recall.*") (emphasis added).)

9. *Lorillard* (and several other cases cited herein) involved *commercial* speech, but the analysis of commercial speech is "substantially similar" to the time, place, and manner analysis applicable to non-commercial speech. 533 U.S. at 554, 121 S.Ct. 2404.

Supreme Court disagreed and reversed the Ninth Circuit. It held that the Court of Appeals had "imposed on [the city] an unnecessarily rigid burden of proof," because the First Amendment does not require a city, "before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated [elsewhere], *so long as whatever evidence the city relies upon is reasonably believed to be relevant.*" *Id.* at 50–51, 106 S.Ct. 925 (emphasis added). In the Court's view, that is true here.

Hensel also argues that the City is *factually* wrong, contending that yard signs do not, in fact, lead to the secondary effects the ordinance (allegedly) is intended to prevent. (Pl. Mem. in Opp'n at 15–20.) She focuses primarily on traffic safety, offering an Affidavit from Joan Claybrook, the former head of the National Highway Traffic Safety Administration (NHTSA), who opines that in her many years working on highway safety, "[n]one of the many studies I consulted indicated that home yard signs were a traffic safety hazard." (Frost Aff. Ex. 1, ¶¶ 6–7.) But Claybrook's Affidavit does not aid Hensel's cause for two reasons. First, Hensel failed to identify Claybrook as an expert witness during discovery, meaning the City never had an opportunity to inquire as to the basis for her opinions. Under these circumstances, Claybrook's opinion is not properly before the Court. *See* Fed. R.Civ.P. 37(c)(1). Second, even if the Court were to consider her Affidavit, she merely indicates that she never *consulted* studies connecting traffic safety with yard

signs; this does not mean such studies do not exist. Indeed, Claybrook's experience is on *highway* safety matters, and hence she may not have had the opportunity to review studies linking yard signs with traffic incidents on smaller scales, including in a rural municipality such as the City here.[10] All told, Hensel's evidence does not undermine the City's common-sense conclusions that yard signs "may restrict views [and] distract motorists." *City of Ladue,* 512 U.S. at 48, 114 S.Ct. 2038.

Finally, Hensel contends that the new sign ordinance is not narrowly tailored because the City has failed to show its interests could not be protected in a less-intrusive way. She argues, for instance, that the City has proffered no evidence indicating that "aesthetics suffered when the yard sign limit was doubled [from one sign to two signs when the new sign ordinance was enacted] in 2012." (Pl. Mem. in Opp'n at 19.) In other words, she contends that the City could permit more signage without undesirable secondary effects necessarily occurring.

But Hensel's argument misapprehends the City's burden in justifying the new sign ordinance. The ordinance "need not be the least restrictive" means of serving the City's interests; a perfect fit between residents' First Amendment rights (on one hand) and the City's interests in traffic safety, property values, and aesthetics (on the other hand) is not required. *Ward,* 491 U.S. at 798–99, 109 S.Ct. 2746. Rather, the ordinance must only avoid impairing "*substantially* more speech than is necessary." *Id.* (emphasis added); *accord,*

---

10. Hensel also attempts to buttress her argument with (1) the City's School District driver's manual and (2) an e-mail from a NHTSA employee. (Pl. Mem. in Opp'n at 17–18.) She claims the manual's "distracted driving" section "discredit[s] any nexus between yard signs and traffic accidents" because it does not *expressly* mention signs. (Frost Aff. Ex.

3.) But the manual *does* mention "visual" distractions, including "looking away from the road" and "reading maps or other materials." (*Id.*) And the e-mail simply states that NHTSA "cannot verify that yard signs ... are a distraction," not that this proposition is demonstrably untrue. (*Id.* Ex. 2.)

*e.g., Hill,* 530 U.S. at 726, 120 S.Ct. 2480 (emphasizing that "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal"). In the Court's view, the ordinance here is reasonably fit to accomplish the City's stated goals, without prohibiting substantially more speech than necessary. *See Lorillard,* 533 U.S. at 554, 121 S.Ct. 2404 (restrictions on speech withstand scrutiny where there is a "reasonable fit" between regulation and stated goals); *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ("What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.") (internal quotation marks and citations omitted). And the Court is "loath to second-guess the [City's] judgment to that effect." *Id.* at 478, 109 S.Ct. 3028. (*See also* Pl. Mem. in Supp. at 5 (recognizing that courts "normally give great deference to a legislative body's determination whether or not a legitimate government purpose is served by an ordinance").)

For these reasons, the Court concludes the City has satisfied its burden of showing the new sign ordinance is narrowly tailored to serve significant government interests.

## C. The ordinance leaves open ample alternative communication channels

■ The final step in analyzing the new sign ordinance is determining whether it leaves open "ample alternative channels for communication." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. Simply put, it does. The ordinance does not ban signs altogether, but simply limits their number and size. *Cf. City of Ladue,* 512 U.S. at 55–59, 114 S.Ct. 2038 (invalidating sign ordinance that banned nearly all signs within city). Residents may also post more than two signs after obtaining a permit, which will issue without the City's consideration of a sign's content. Moreover, residents may "go door-to-door to proselytize their views [and] may distribute literature in this manner ... or through the mails." *Frisby v. Schultz,* 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). They may contact others by telephone, speak at public meetings, place messages on their cars, or use the internet or local media. *Id.; Phelps–Roper v. City of Manchester,* 697 F.3d 678, 695 (8th Cir.2012). In fact, the record reveals that Hensel availed herself of several such "alternative channels," including parking her van, with signs prominently displayed, all around the City and using the local public-access television station to communicate her views. (Hensel Dep. at 58, 113–14; Abraham Aff. ¶¶ 3–4.)

Hensel retorts that *City of Ladue* determined "alternative means" such as these were not "ample." (Pl. Mem. in Opp'n at 20–21.) But a critical difference between that case and the case *sub judice* is that Ladue banned *nearly all residential signs.* Governmental action generally will not be invalidated for failing to leave open ample alternative channels of communication unless an *entire medium* of public expression across a particular community has been foreclosed. *See Hill,* 530 U.S. at 726, 120 S.Ct. 2480; *Metromedia,* 453 U.S. at 525–27, 101 S.Ct. 2882 (Brennan, J., concurring). The Supreme Court has been especially hesitant to permit municipalities to completely close off channels of communi-

cation that provide inexpensive means of disseminating political messages. *See, e.g., City of Ladue,* 512 U.S. at 54–56, 114 S.Ct. 2038; *Martin v. City of Struthers,* 319 U.S. 141, 146, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (holding invalid under the First Amendment a statute banning door-to-door distribution of handbills and circulars); *Lovell v. City of Griffin,* 303 U.S. 444, 451–52, 58 S.Ct. 666, 82 L.Ed. 949 (1938) (invalidating ordinance banning distribution of pamphlets).

But the facts here stand in stark contrast to *City of Ladue.* Hensel has not been completely barred from posting yard signs; indeed, she may post two signs without any government interference, and she may post additional signs with a permit, the issuance of which is not keyed to the messages she seeks to convey. She also enjoys several other methods of conveying her messages. Accordingly, the Court concludes the new sign ordinance leaves open ample alternative channels of communication.

## D. Conclusion

For all of these reasons, the Court determines that the new sign ordinance is a valid time, place, and manner restriction—

it is content-neutral and serves substantial government interests without unreasonably limiting alternative avenues of communication. Accordingly, the City's Motion will be granted, and Hensel's Motion denied, as to Count I of the Third Amended Complaint, which will be dismissed.[11]

## III. The bench ordinance

Count II of the Third Amended Complaint challenges both the old and new bench ordinances under the First Amendment. (*See* 3rd Am. Compl. ¶ 40.) The Court first considers the old ordinance, which Hensel attacks only for the purpose of recovering damages, and then considers the new ordinance, for which the parameters of Hensel's challenge is somewhat unclear.

### A. The old bench ordinance

■ Hensel contends that the old bench ordinance—which was in effect when the City denied her request (through JMR2) to place an advertising bench near City Hall—was facially unconstitutional because it granted "unbridled or limitless discretion" to the City when considering bench applications. (Pl. Mem. in Opp'n at 25; *see also* 3rd Am. Compl. ¶ 41.)[12] In par-

---

11. Hensel also argues that the new sign ordinance was "enacted and selectively ... enforced against [her] because of hostility towards her liberal viewpoints." (Pl. Mem. in Opp'n at 22.) Suffice it to say, the record does not support these claims. It is undisputed the City first enacted a sign ordinance long before 2011, when Hensel began posting political signs in her yard, and started the process of amending the ordinance *three years* before the events in question here, belying any claim it enacted the ordinance for retaliatory reasons. As for the alleged "selective" enforcement, Hensel argues, without citation to authority, that a "complaint-driven" enforcement policy such as the City's is unconstitutional. (*Id.* at 23–24.) The Eighth Circuit has rejected such a categorical approach. *See Osborne v. Grussing,* 477 F.3d 1002, 1007

(8th Cir.2007) (noting that municipalities "routinely act on the basis of information provided by private parties who harbor a grudge," but when "such a complaint results in enforcement action, we do not impute the complainant's ulterior motive to the government enforcers"). Rather, Hensel's selective-enforcement "claim" survives only if she can offer evidence tending to show City officials induced others to file complaints "in order to camouflage a governmental intent to retaliate" because of her viewpoints. *Id.* No such evidence exists in the record here.

12. In her Memorandum, Hensel purports to assert a due-process claim based upon the same allegation (*see* Pl. Mem. in Supp. at 15), but such a claim is absent from the Third Amended Complaint.

ticular, she argues that the ordinance was unlawful because it reserved to the City the right to deny advertising for any reason at all, including based on its wording. (Pl. Mem. in Opp'n at 27 ("[T]he text of the [old bench ordinance] explicitly authorized [the City] to vet bench advertising proposals for content.") (emphasis deleted); *see also* Kasella Aff. Ex. 13, § 5.33.F (granting the City the right to review the wording of bench advertisements and to reject any advertisement).) In response, the City focuses not on the merits but on standing, arguing that Hensel was impoverished at the time she sought an advertising bench and, hence, would not have been able to pay JMR2's $400 fee. (*See* Def. Mem. in Supp. at 22–24; Def. Mem. in Opp'n at 21.) Accordingly, it contends she had at most a *"plan* to advertise" and not the ability to carry out that plan, which (ostensibly) "does not provide [her with] an actual or concrete injury to support standing." (Def. Mem. in Opp'n at 22 (emphasis added).) The Court does not agree.

It is well-settled that a *facially* invalid ordinance may be challenged regardless of whether the plaintiff actually sought approval (such as a permit) thereunder. *See, e.g., City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."). This scuttles the City's standing argument. If Hensel need not have even sought to place an advertising bench · in order to facially challenge the old bench ordinance, *see id.*, then in the Court's view it makes no difference whether she actually possessed the funds needed to do so.[13]

Moreover, the Court agrees with Hensel that the old bench ordinance cannot withstand scrutiny. *See, e.g., id.* at 755–59 (scheme giving government unlimited discretion to grant or deny license facially unconstitutional);[14] *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 149–50, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (invalidating ordinance requiring city to issue permit unless in "its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience required that it be refused"). Indeed, the City's own attorney appeared to acknowledge the old bench ordinance's infirmities at the April 2, 2012 City Council "work session," noting that the ordinance required revising. (*See* Kasella Aff. Ex. 18.)

Nevertheless, the City now contends that the old bench ordinance, in fact, left it with "no control over the content of the benches." (Def. Mem. in Opp'n at 24.) But in support, it cites *the new bench ordinance*—which removed the troubling

---

**13.** In any event, Hensel has proffered a "Statement" from Robert P. Johnson—which is notarized, unlike the other "Statements" she has submitted (see *supra* note 8)—who avers that he is financially supporting her efforts here and "was willing and able to provide the funds necessary for the bench." (Frost Aff. Ex. 10.)

**14.** *City of Lakewood* makes clear that it is irrelevant whether the City *actually* denied Hensel's application because of the bench's proposed content or, rather, for other reasons. 486 U.S. at 757, 108 S.Ct. 2138 ("[T]he mere *existence* of [unbridled] discretion, combined with power of prior restraint, intimidates speakers into censoring themselves *even if the discretion and power are never actually abused* .... Proof of an abuse of power in [a] particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas.") (emphases added) (internal quotation marks and citation omitted).

**932**

provisions giving the City unfettered discretion to reject any advertisement and the right to review an advertisement's "wording"—rather than the old one. (*See* Def. Mem. in Opp'n at 24–25.) While this is perhaps a tacit acknowledgement that the old bench ordinance could not pass muster, that conclusion is nevertheless evident from the text of the ordinance itself, which left the City free to deny an advertising bench for any reason, including because of its disagreement with the message conveyed. Such a scheme simply cannot stand. *See City of Lakewood,* 486 U.S. at 755–59, 108 S.Ct. 2138; *Shuttlesworth,* 394 U.S. at 149–50, 89 S.Ct. 935.

For these reasons, and in the absence of any other argument from the City defending the old bench ordinance, Hensel is entitled to summary judgment on Count II of the Third Amended Complaint insofar as it concerns the old bench ordinance. The amount of damages to which she is entitled, however, will have to await trial.

**B. The new bench ordinance**

As noted above, Count II also purports to challenge the *new* bench ordinance. But the parameters of that challenge are difficult for the Court to discern; indeed, Hensel offers an ever-moving target.

The Third Amended Complaint alleges that the new bench ordinance cannot pass muster because it "[e]ndows [the City] with limitless discretion in determining whether to permit a bench rental."

(3rd Am. Compl. ¶ 41(A).) [15] This allegation sings the same refrain as Hensel's challenge to the old bench ordinance. But the dubious provisions of that ordinance have now been removed—at this juncture, the City enjoys the authority only to regulate the *placement* and *location* of benches. (Kasella Aff. Ex. 14.) And Hensel has not indicated how this regulatory scheme somehow confers "limitless discretion" upon the City or why it is unlawful. [16] The new bench ordinance appears to be nothing more than a content-neutral time, place, and manner restriction, similar in nature to the new sign ordinance discussed above. (*See* Kasella Aff. Ex. 20; Reuvers Aff. Ex. 9 at 2–3 (noting concerns about traffic visibility caused by benches).) [17]

In her Motion for Summary Judgment and supporting Memorandum, however, Hensel changed tacks. Instead of continuing to claim that the new bench ordinance is infirm because it grants the City "limitless discretion," she argued instead that the ordinance lacks certain "procedural safeguards" rendering it invalid. (*See* Pl. Mem. in Supp. at 13–15.) Yet, Hensel could not modify her claims through her summary-judgment brief. *See, e.g., McClennon v. Kipke,* 821 F.Supp.2d 1101, 1109 (D.Minn.2011) (Kyle, J.). The deadline for amending the pleadings has long passed, Hensel has already had several bites at the pleading apple, and the Court perceives no reason why it would be appropriate to permit her to alter the nature

---

15. The Third Amended Complaint also alleges that the City has "practic[ed] viewpoint discrimination in enforcing the bench ordinance[]" against Hensel. (3rd Am. Compl. ¶ 41(B).) But there is no indication that the *new* bench ordinance has been enforced against her—the record reveals that she sought, and was denied, the opportunity to place an advertising bench only in early 2012, while the *old* bench ordinance was still in effect.

16. Indeed, Hensel has undermined such an argument by acknowledging, under the new ordinance, that *"all bench advertising content is permitted,"* save for alcohol and tobacco products (which Hensel does not challenge). (Pl. Mem. in Opp'n at 30 (emphasis added).)

17. Notably, the new bench ordinance was enacted at the same time as the new sign ordinance.

of her claims, to address these "procedural" matters, at this late stage.

Further compounding the confusion, Hensel changed tacks yet *again* in her opposition to the City's summary-judgment Motion. The City argued at length in its Motion that the new bench ordinance passes constitutional muster (*see* Def. Mem. in Supp. at 24–27), but Hensel's response made no mention of the procedural safeguards recounted in her moving brief. Instead, she turned her focus *back to the allegations in the Third Amended Complaint*, namely, the new bench ordinance (allegedly) confers limitless discretion on the City. Yet, her argument now is more tentative than in her pleading: short of contending the new bench ordinance is flatly unlawful, she now contends it "*seems* to [permit the City] to reject bench advertising based on content," for which she "suggests that the Court *consider encouraging* [the City] to *clarify* the [ordinance's] language ... to explicitly prohibit ... content-based advertising restrictions." (Pl. Mem. in Opp'n at 30–31 (emphases added).)

Putting aside that Hensel's argument appears to acknowledge the new bench ordinance's constitutionality, this Court cannot accede to her request. The new bench ordinance either passes muster or does not; it cannot be "seemingly" valid or invalid. And it is not this Court's job to review the new sign ordinance and opine whether it is constitutional "in the air," so to speak. *See Castro v. United States*, 540 U.S. 375, 386, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) (Scalia, J., concurring in part and concurring in judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."). Nor is it appropriate for this Court to "encourage" the City to "clarify"

the new bench ordinance. *See North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (*per curiam*) ("To be cognizable in a federal court, a suit must be definite and concrete [and must comprise] a real and substantial controversy *admitting of specific relief through a decree of a conclusive character*.") (emphasis added) (citation omitted).

Without belaboring the point, the Court concludes the new bench ordinance—like the new sign ordinance—is a content-neutral time, place, and manner regulation, and Hensel's moving-target allegations have not provided any clear basis to undermine that conclusion. Accordingly, her challenge to the new bench ordinance fails.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that the parties' Motions for Summary Judgment are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Hensel's Motion (Doc. No. 147) is **GRANTED** as to Count II of the Third Amended Complaint insofar as it concerns the *old* bench ordinance. A jury trial will be scheduled to determine Hensel's damages with respect to that claim. In all other respects, her Motion is **DENIED;** and

2. The City's Motion (Doc. No. 132) is **GRANTED** as to Count I of the Third Amended Complaint, and as to Count II of the Third Amended Complaint insofar as it concerns the *new* bench ordinance, and those claims are **DISMISSED WITH PREJUDICE.** In all other respects, the Motion is **DENIED.**

For the sake of clarity, all that remains for resolution (at trial) is the amount of damages to which Hensel is entitled to recover from the City with respect to her

claim under the old bench ordinance (Count II).[18]

18. The Court anticipates Hensel will seek an award of attorneys' fees in connection with Count II. The Court reminds her that any such application must be tailored to reflect her limited success in this case. *See, e.g., El–Tabech v. Clarke*, 616 F.3d 834, 843 (8th Cir. 2010) ("The degree of plaintiff's success is 'the most critical factor' in selecting a reasonable fee award.") (quoting *Farrar v. Hobby*, 506 U.S. 103, 114–15, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)); *Butler v. Dowd*, 979 F.2d 661, 676 (8th Cir.1992) (while strict proportionality is not required, "[t]he amount of damages a plaintiff recovers is certainly relevant to the amount of attorney's fees to be awarded.") (citation omitted).